[No. S014394. Aug. 17, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
FERMIN RODRIGUEZ LEDESMA, Defendant and Appellant.

COUNSEL

Donald M. Thommen and Jeffrey J. Stuetz, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, Moona Nandi and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—After a retrial following reversal of defendant's conviction and death sentence, defendant was convicted of first degree murder, kidnapping, and two counts of robbery, and true findings were returned on allegations that he personally used a firearm in the commission of these offenses. (Pen. Code, §§ 187, 207, 211, 12022.5, 1203.06.)[1] Two special circumstances were found true—the intentional killing of a witness, and murder in the commission of a robbery. (Former § 190.2, subd. (c)(2), (3)(i) & (ii).)[2] After the penalty phase of the trial, the jury returned a verdict of death and the trial court denied defendant's motion to modify the death verdict. (§ 190.4, subd. (e).) This appeal is automatic. (§ 1239, subd. (b).) We reverse one of the robbery counts and the robbery special circumstance, but in all other respects affirm defendant's conviction and death sentence.

I. FACTS

The trial, which took place in 1989, was defendant's second trial for offenses arising out of the robbery and murder of Gabriel Flores in 1978. Defendant first was convicted of these crimes and sentenced to death in 1980. In addition to his automatic appeal in that matter, defendant filed a habeas corpus petition in this court alleging that his trial attorney had provided constitutionally ineffective assistance. We appointed a referee to take evidence and make findings of fact and conclusions of law regarding that claim. The referee concluded, and this court agreed, that trial counsel had provided defendant with inadequate legal assistance on the basis of numerous inadequacies in his representation, including counsel's failure to conduct adequate investigation and research, in particular with regard to the defense of

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] Because defendant's offenses took place in August and September of 1978, his case is governed by the death penalty law that was adopted by the Legislature in 1977. (Stats. 1977, ch. 316, § 9, p. 1257.) That law subsequently was replaced by an initiative measure approved by the voters on November 7, 1978.

diminished capacity. (*People v. Ledesma* (1987) 43 Cal.3d 171, 223, 224 [233 Cal.Rptr. 404, 729 P.2d 839] (hereafter *Ledesma I*).) Accordingly, we vacated the judgment and remanded defendant's case to the superior court.

At the retrial, the prosecution presented evidence that on August 26, 1978, Mr. Flores was working at a Hudson gas station in the City of San Jose. That afternoon, he called his manager at home and reported that he had just been robbed and had obtained the license number of the motorcycle used by the robbers. Police officers went to the gas station and interviewed Mr. Flores. He described the robbers as two Mexican males, and explained that one of them stayed on the motorcycle and the other brandished a white gun and asked for his money. One of the robbers took some cash and went through some drawers, and the two men then left. About $30 was missing from the gas station. Mr. Flores provided the police officers with the license plate number of the motorcycle.

Police officers received a radio broadcast indicating that the motorcycle was registered to defendant, and they promptly went to the address listed on the motorcycle registration. They were told that defendant no longer lived there, and were directed to his current residence. When the officers arrived at defendant's apartment, he was not at home. Two visitors let them in, one of whom was Millie Dominguez. While they were there, the telephone rang and a police officer answered it, speaking in Spanish and identifying herself as Millie Dominguez. The caller identified himself as Fermin Ledesma and said that he was "hot," that the police were looking for him, and that she should lock the apartment and the doors of his car and take a walk. The police were unsuccessful in locating defendant at that time.

Three days after the robbery, the police showed Mr. Flores a six-image photographic lineup. He identified a picture of defendant as looking like the person who held the gun during the robbery. The police then obtained a warrant for defendant's arrest. On September 1, 1978, police officers proceeded to defendant's apartment. They did not find him there, but defendant's friend Jesse Perez was in the apartment. Because Jesse resembled the description of the second robber, the police took him into custody for questioning. During the interview, Jesse was told that a warrant had been issued for defendant's arrest, that Jesse was also a suspect, and that a photographic lineup with Jesse's picture would be shown to the victim. He was released after the interview.

A few days later, on September 5, 1978, Mr. Flores disappeared. At approximately 3:00 that afternoon he had started work at the same gas station

that had been robbed about one week earlier. Later that evening, the police found the gas station open but with no attendant on the premises. Three days later, on September 8, 1978, Mr. Flores's body was found in a ravine in the City of Gilroy. There were four gunshot wounds to his body from .22-caliber bullets, and two stab wounds to the chest. Mr. Flores had been wearing light tan boots when he arrived at work on the day he disappeared, but when his body was found it lacked any footwear. He had no paper money in his pockets, only a small number of coins. According to the gas station manager, Mr. Flores normally carried about $30 in cash when he was working, so that he could make change for customers. Three or four days after Mr. Flores disappeared, the manager noticed that a tapestry that had been hanging in the gas station was missing.

Defendant was not immediately arrested because, shortly after the killing, he moved to Salt Lake City, Utah. In March of 1979, a deputy sheriff who was attempting to locate defendant in San Jose pulled over a car in which defendant was a passenger. When the deputy asked defendant his name, he replied "you have the right guy," and he was arrested for the robbery and murder of Mr. Flores.

No physical evidence connected defendant to the gas station robbery or the murder, but a number of witnesses testified that defendant had admitted committing the crimes. At trial, Santiago Ontiveros, a friend of defendant's, denied remembering anything defendant told him about the robbery, but in a taped interview he had told the police that defendant had said he committed the robbery with Jesse Perez. Sylvia Lopez Ontiveros, who had been married to Santiago Ontiveros, also denied at trial remembering that defendant had said anything to her about the crimes. Her contrary preliminary hearing testimony was read into the record. She testified at the preliminary hearing that during a telephone call, defendant told her he had killed a person who had identified him in a robbery. According to that testimony, defendant told her that if he eliminated the witness, there would be no one to testify against him. When he went to the gas station, the victim did not recognize him, but was killed anyway. Defendant told Sylvia Ontiveros that he was going to leave town and change his identity. A statement made by Sylvia Ontiveros to the police was consistent with her preliminary hearing testimony.

Jona Cardona, who had been George Perez's girlfriend at the time of the crimes, testified that she overheard a conversation in which defendant said that he and Jesse had robbed a gas station and that the person they robbed had identified defendant from a photograph and knew his motorcycle license number. According to Cardona, defendant said he was going to obtain

revenge on the man who worked at the gas station. Later, after she learned the man had been killed, she overheard another conversation in which defendant and George Perez discussed how the man had died: Defendant and three others—George, Jesse, and someone known as "Crazy Joe"—went to the gas station and asked the man to put some oil in the back of their truck. They pushed him into the truck, drove him into the mountains, and shot and stabbed him. In another conversation recounted by Cardona, the other individuals teased Jesse because he would not stab the man and because he stole the man's boots. After defendant had been arrested, Cardona made an anonymous telephone call to the police to report what she had heard, because she believed that defendant was receiving all the blame even though others were involved. A tape recording of that telephone call was played at the trial.

Cardona's sister, Shirley Chavez, testified that she had overheard a conversation between defendant, George Perez, and "Crazy Joe." According to Chavez, in this conversation defendant did most of the talking. He said that he and Jesse had robbed a gas station. Later defendant, Jesse, George, and Joe went back and kidnapped the victim because he had selected defendant's picture from a lineup. Defendant shot him. He asked the others to stab the victim so that he would not be the only person involved. They dumped the body in an orchard. Jesse kept the victim's boots.

As noted above, shortly after the murder, defendant moved to Salt Lake City. Two men who met defendant while he was in Utah testified that defendant had admitted committing a robbery and murder. Michael Shay testified that in 1979 defendant told him he was wanted for a gas station robbery and a murder in California. Defendant told Shay he had warned the victim not to "narc" on him. He returned to the gas station, asked the attendant to put a case of oil into his vehicle, and then shoved him into the vehicle. According to Shay, defendant said he drove the victim to the mountains and shot him in the head and chest. Similarly, Floyd Cowdell testified that defendant told him he had committed a robbery at a gas station and had gone back to kill the witness, and that he was wanted for murder. Defendant said he kidnapped the attendant, took him into the hills, and shot and stabbed him.

The defense contested the prosecution's case in numerous respects. It challenged on a variety of grounds the credibility of each prosecution witness who testified concerning defendant's admissions, including the witnesses' drug use at the time of the crimes, bad character, motives to lie and to curry favor with the police, and prior inconsistent statements. The defense also

offered evidence that the murder may have been committed by one Joe Guerra, the "Crazy Joe" mentioned in some of the witnesses' testimony as a participant in the crimes. Jona Cardona identified a picture of Guerra as looking like the person she had referred to as "Crazy Joe." The police had interviewed Guerra in connection with the present case. In that interview, Guerra denied involvement in this offense but admitted setting up hits for the Mexican Mafia. His former girlfriend testified that he once asked her what she would think if he told her he had killed the person at the Hudson gas station in 1978, but she told him she did not want to hear about it.

The defense, in support of two alternative theories, presented lay and expert testimony regarding defendant's personality and mental condition. The first theory was that, to the extent defendant may have made statements admitting these crimes, he either was telling lies to make himself seem more important to his peers, or, because of his extensive drug use, he did not really remember whether he had committed the crimes and was using information he received from other persons to fill the gaps in his memory. Second, defendant claimed diminished capacity. Defense experts opined that defendant was incapable of premeditating or forming the intent to kill at the time the crimes occurred, because of his extensive phencyclidine (PCP) use combined with his low intelligence and the effects of brain damage caused by beatings he received as a child and exposure to toxic chemicals.

In support of these mental defect defenses, several witnesses testified concerning defendant's heavy use of PCP in 1978. Witnesses also testified that he was more of a follower than a leader and that he had a propensity to exaggerate or tell lies to make himself seem more successful and important to his peers. Prosecution witness Floyd Cowdell testified that when defendant told him about the crimes, he appeared to be trying to act "macho." When defendant was a child, he was frequently beaten by his father and his older brother. He was teased as a child because he was slower than other children and had buck teeth and a large cyst over his eye.

An expert on drug addiction, Dr. H. Westley Clark, testified for the defense that PCP alters perceptions and can cause psychosis, delusions, and hallucinations. As Dr. Clark explained, a person under the influence of PCP could appear to function normally but have a memory gap, which is similar to what occurs in an alcohol blackout. Persons who have memory gaps tend to deduce what happened or fill the gap with information suggested by another person, and come to believe that they actually remember the prior event. Dr. Clark opined that the memory of a chronic PCP user generally would be unreliable

and that a person under the influence of PCP could not deliberate, although he or she might be able to form the intent to kill.

A psychologist, Dr. Anne Evans, testified concerning the results of psychological tests she performed on defendant. His intelligence quotient was in the low average range, but he scored much lower on the verbal test than on other aspects of the tests. The tests she administered suggested the possibility of brain damage. When defendant was young, he was teased by his peers because of the cyst over his eye and his buck teeth, and because he was skinny and slow. According to Dr. Evans, defendant attempted to compensate for his feelings of inadequacy by bragging. Dr. Evans asserted that if defendant claimed he was involved with the killing, it is possible he could have convinced himself that was true after hearing other individuals say this was so, or that he was trying to build himself up. Defendant told her he thought he knew who had committed the crime but could not tell her who it was. He also said he could not remember but believed he was not responsible, while acknowledging it seemed possible that he was. Dr. Evans opined that, in 1978, defendant could not have premeditated, and lacked the capacity to deliberately intend to kill or to form malice—both because of his mental defects and because PCP interferes with impulse control and with the ability to deliberate and think clearly, sometimes to the point of causing psychosis.

Dr. Eric Morganthaler, a licensed clinical psychologist who performed neuropsychological tests on defendant, found him to be fine in some areas but impaired in others. According to Dr. Morganthaler, defendant is able to function in the world but is slow in processing information and responding to it. His pattern of neurological defects suggests organic brain damage. Dr. Morganthaler explained that defendant's history of head traumas, his chronic drug use, and his exposure to toxic chemicals were possible sources of brain damage and that persons with brain damage are generally more susceptible to the effects of drugs.

Dr. Fred Rosenthal, a psychiatrist, testified that defendant appeared to have brain damage that produced lapses of judgment and an inability to think creatively and deal with complex material. According to Dr. Rosenthal, defendant had low self-esteem because of his chaotic childhood and the beatings he suffered during that period. Dr. Rosenthal explained that defendant resorted to drugs for relief from both psychic and physical pain and that defendant's need to feel powerful and overcome feelings of worthlessness could lead him to exaggerate matters, such as admitting a killing he did not commit. According to Dr. Rosenthal, even telling a doctor that he committed

a murder could be a way of establishing power in the relationship, and a person who was intoxicated with PCP would lack the ability to deliberate or think clearly, or to form the mental states of express or implied malice. Finally, Dr. Rosenthal stated that a person with brain damage tends to be more sensitive to further injury and to drugs.

Dr. Michael Radelet, a sociologist, testified concerning a study he had conducted of persons who had been convicted of murder but who were in fact innocent of that charge. Dr. Radelet found that false confessions sometimes occur when the person does not actually remember the crime but confesses, believing himself responsible, and when the person knows he did not commit the crime but is boasting. Dr. Radelet stressed that drug use and a history of making false statements reduce the probability that a confession is true.

On rebuttal, the prosecution presented the testimony of Dr. John Glathe, a psychiatrist who had been appointed by the court to examine defendant and advise defense counsel before defendant's first trial. Dr. Glathe testified that defendant told him he had committed the robbery at the gas station and that one week later he went back and kidnapped the victim, killing him by shooting and stabbing him.

The prosecution also presented testimony from a psychiatrist, Dr. Lee Coleman, who challenged the reliability of the defense experts and disputed their conclusions. Dr. Coleman opined that the various psychological tests and assessment tools employed by the defense experts were unreliable or irrelevant to the issues and that none of them were useful in determining, after the fact, the nature of a defendant's state of mind at an earlier time. In Dr. Coleman's opinion, although the use of drugs could incapacitate a person to the extent that he or she could not form the intent to commit a crime, a person so impaired by drugs would lose the ability to act before losing the ability to form the intent to act. In Dr. Coleman's view, the most reliable indicator of a person's intent is "what they do, how they do it, and the context in which they do it," and laypersons are just as successful, if not more so, as mental health professionals in determining a person's intent. Dr. Coleman asserted that the presence of organic brain disorder reveals nothing about a person's intent; in Dr. Coleman's view, if the brain disorder interferes with intent, that same disorder also would be reflected in the person's behavior. Furthermore, in Dr. Coleman's opinion, none of the evidence presented by the defense experts supported the conclusion that defendant had organic brain damage.

The jury found defendant guilty on all charges and found true the various allegations, including the special circumstances. At the penalty phase, the prosecution presented evidence that when defendant was in Utah during

February 1979, he committed two armed robberies of gas stations and an attempted robbery of a market. During the attempted robbery, defendant fled from the store when the owner produced a shotgun. Floyd Cowdell testified that defendant told him that the store owner took a shot at him and he shot back.

In mitigation, defense counsel presented testimony concerning defendant's history and background that supplemented the information presented during the guilt phase, relating to the abuse suffered by defendant as a child. Mr. Schiraldi, a social worker, conducted a background investigation of defendant's social history and described how defendant was beaten as a child and teased because of his appearance and mental slowness. Schiraldi reiterated that, as a result, defendant suffered from low self-esteem and turned to drugs at an early age. When defendant married and began residing with his wife, he was doing relatively well, working hard and relying less on drugs and alcohol. He discovered, however, that his wife was being unfaithful to him. The social worker explained that after defendant and his wife separated, he resided with an aunt and an uncle in Coalinga, where he worked regularly, helped around the house, and contributed financially to the household. Still, the social worker testified, defendant was very depressed about having separated from his wife and his children, eventually returning to San Jose in the hope of reuniting with them. When this effort was unsuccessful, his drug use increased.

Several witnesses testified that during the time defendant was incarcerated, he became more religious, accepted responsibility, and felt remorse for his crimes. Defendant expressed remorse to Dr. Rosenthal and said he was disturbed by the realization that defendant was involved in someone having been killed. Dr. Rosenthal was aware defendant had wanted to plead guilty. A jury consultant who worked for the defense testified that defendant consistently desired to plead guilty and receive a life sentence.

Defendant's cousin corresponded with defendant while defendant was in prison, instructing him on the Bible. She testified that defendant wanted to make peace with God and be forgiven for his sins. The chaplain at the county jail testified that defendant took communion, had expressed remorse for his past lifestyle, had great concern for his daughters, and hoped he still could do something productive with his life. Father Wood, a Jesuit priest who had discussed defendant with the jail chaplain and had met defendant once, testified that defendant admitted committing a crime and said he was sorry.

Father Wood thought defendant felt remorse and wished to be allowed to live so that he would have the opportunity to repent. A psychologist who worked in the prison system testified that, if given a life sentence, defendant would have a chance to do useful work, improve his education, and participate in a religious program.

## II. GUILT PHASE ISSUES

### A. *Grand Jury Indictment*

■ Defendant contends that under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution he could not be lawfully prosecuted for a capital offense or sentenced to death in the absence of a grand jury indictment. To the contrary, California's practice of charging by information after a preliminary hearing does not violate the federal Constitution. (*Rose v. Mitchell* (1979) 443 U.S. 545, 577, fn. 7 [61 L.Ed.2d 739, 99 S.Ct. 2993]; *Hurtado v. California* (1884) 110 U.S. 516, 538 [28 L.Ed. 232, 4 S.Ct. 111]; *In re Terry* (1971) 4 Cal.3d 911, 926 [95 Cal.Rptr. 31, 484 P.2d 1375].) Grand jury oversight of the prosecutor's decision to seek the death penalty is not compelled by the Eighth Amendment. "[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." (*People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].) No authority supports defendant's contention.

### B. *Jury Selection*

#### 1. *Number of peremptory challenges*

■ Defendant argues that the trial court erred in limiting him to 20 peremptory challenges. At the time of his first trial, section 1070 permitted each side in a capital case to exercise 26 peremptory challenges. Section 1070 was repealed effective January 1, 1989. (Stats. 1988, ch. 1245, § 30, p. 4155.) The same enactment added Code of Civil Procedure, section 231, subdivision (a), which provides only 20 peremptory challenges to each side in a capital case. (Stats. 1988, ch. 1245, § 2, pp. 4140, 4152.) Defendant argues that former section 1070 governed his case because (1) he was entitled to have his second trial conducted under procedures no less beneficial to him than the first trial, and (2) pretrial proceedings—including motions and discovery—began in his retrial before the effective date of Code of Civil Procedure section 231.

A new or amended statute applies prospectively only, unless the Legislature clearly expresses an intent that it operate retroactively. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434].) "[A] law governing the conduct of trials is being applied 'prospectively' when it is applied to a trial occurring after the law's effective date, regardless of when the underlying crime was committed." (*Id.* at p. 289.) Application of a change in law that occurred after the crime took place is retroactive only if it changes the legal consequences of a defendant's past conduct. (*Id.* at p. 298.) In *Tapia*, this court held that changes in the procedures for conducting voir dire that were made by Proposition 115 could be applied to the defendant's case even though the crime with which he was charged took place before the effective date of the changes. (53 Cal.3d at p. 299.) Likewise, application in defendant's trial of Code of Civil Procedure section 231, subdivision (a)'s changes to the procedures for voir dire did not constitute a retroactive application of that statute.

We reject defendant's argument that application of Code of Civil Procedure section 231 to his case is retroactive because the pretrial portions of his trial began before that statute went into effect. The operative date for determining prospective application of a statute is the "date of the conduct regulated by the statute." (*Tapia v. Superior Court, supra,* 53 Cal.3d at p. 291; see *People v. Hayes* (1989) 49 Cal.3d 1260, 1274 [265 Cal.Rptr. 132, 783 P.2d 719] [holding that a new statute specifying conditions under which the testimony of a witness who has undergone hypnosis may be admitted could not be applied in a retrial after the effective date of the statute when the witness had been interviewed under hypnosis before the effective date of the statute].) Code of Civil Procedure section 231, subdivision (a) governs the conduct of the jury selection portion of the trial. Therefore, application of the statute that was in effect at the time defendant's jury was selected is a proper, prospective application of the statute.

Defendant also argues that he should have been tried under the procedures applicable at his first trial, because he was entitled to be placed in no less advantageous a position had he not been denied his constitutional right to effective representation at his first trial. In other words, he contends that the reduction in the number of peremptory challenges available to him constituted a form of prejudice caused by his first attorney's ineffective assistance. Defendant's contention that the application of Code of Civil Procedure section 231 to his case can be attributed to his counsel's ineffectiveness is questionable, but even if he were correct, he has failed to establish that he was prejudiced. If former section 1070 had been applied at trial, the prosecution would have been entitled to the same number of peremptory challenges as the defense. There is no basis in this record upon which to conclude that it would have been to defendant's advantage had both sides been given additional challenges.

Defendant argues that even if he was not statutorily entitled to 26 peremptory changes, the trial court abused its discretion in denying him those additional challenges. Defendant contends that the court erroneously believed it lacked the power to grant additional challenges and therefore failed to exercise its discretion. In denying defendant's request for 26 peremptory challenges, the court cited *People v. Whitmore* (1967) 251 Cal.App.2d 359 [59 Cal.Rptr. 411] and *People v. Carter* (1961) 56 Cal.2d 549 [15 Cal.Rptr. 645, 364 P.2d 477], two cases that appear to support the proposition that the trial court may not grant more peremptory challenges than are permitted by statute. (But see *People v. Bittaker* (1989) 48 Cal.3d 1046, 1088 [259 Cal.Rptr. 630, 774 P.2d 659] [when a defendant claims the court erroneously denied a challenge for cause and expresses dissatisfaction with the jury, granting an additional peremptory challenge may be an appropriate remedy].) Even if we assume the trial court was mistaken about the scope of its authority, we find no abuse of discretion here, because defendant has not provided any justification—either to this court—or to the trial court for the trial court to have exercised its discretion to grant defendant 26, rather than 20, peremptory challenges. Furthermore, to support a claim that he is constitutionally entitled to more peremptory challenges than are provided by statute, a defendant must establish "at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin* (1988) 46 Cal.3d 659, 679 [250 Cal.Rptr. 687, 758 P.2d 1217].) Defendant has not made such a showing.

### 2. Death penalty voir dire

Defendant makes a number of challenges to the adequacy of the procedures employed during the voir dire of jurors concerning their views regarding the death penalty. Prospective jurors initially filled out a lengthy questionnaire addressed solely to their views concerning the death penalty. Each was then questioned individually concerning his or her ability to make a penalty decision, in accordance with then applicable procedures established in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. Those jurors who were not excused during the *Hovey* voir dire then completed a second questionnaire, which addressed their general qualifications, and participated in the general voir dire. In a few instances, discussion of some jurors' views regarding the death penalty also took place during the general voir dire. Defendant contends that the jury selection process was arbitrary and unfair, in violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 7 and 15 of the California Constitution, in numerous respects. As explained below, we find no error.

The trial court's denial of defense counsel's request to provide the jurors with a single, consolidated questionnaire on both death penalty and general issues did not deprive counsel of the use of general information critical to an adequate *Hovey* voir dire. Those jurors who were not disqualified during the *Hovey* voir dire were required to complete the subsequent general question-naire. As in *People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127], "[d]efendant was not precluded from attempting to show in the subsequent general voir dire that a juror harbored any specific bias that would cause him to vote for the death penalty without regard to mitigating evidence, and thus should be excused for cause." (See also *People v. Medina* (1995) 11 Cal.4th 694, 746 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Defendant's contention that the *Hovey* voir dire was inadequate because the trial court conducted it without a full understanding of the applicable death penalty law is without merit. As noted above, these proceedings were governed by the version of the death penalty law that was adopted by the Legislature in 1977, rather than the version of the law adopted by initiative in November of 1978, shortly after the charged offenses were committed. Defendant contends the trial court was under the mistaken impression that jurors would be instructed to "weigh" aggravating and mitigating factors (as required by the 1978 death penalty law) in addition to being instructed to "consider, take into account, and be guided by" the factors (as required by both the 1977 and 1978 laws). (See § 190.3; former § 190.3, added by Stats. 1977, ch. 316, § 11, pp. 1258–1260.) Under both laws, the jury must consider the aggravating and mitigating factors and has the "responsibility to decide what penalty is appropriate under all the relevant circumstances." (*People v. Brown* (1985) 40 Cal.3d 512, 544 [230 Cal.Rptr. 834, 726 P.2d 516].) The weighing requirement simply makes clear that jurors are to limit their consideration to the factors listed in the statute. (*Ibid.*; *People v. Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782].) It is inconceivable that the difference between the two laws could have made a significant difference in any juror's ability to follow the law and impartially consider both possible punishments.

We cannot conceive of how defendant could have been prejudiced by the circumstance that, during voir dire, the jurors were told by the trial judge and defense counsel that the words "life without possibility of parole" mean exactly what they say, but were told later, during deliberations, to ignore the possibility that a person serving a term of life without possibility of parole might someday be released. Instructing jurors to take literally the words "life without possibility of parole" served to impress upon them the seriousness of their decision and to overcome the common misperception that all life prisoners may eventually be paroled. (See *People v. Thompson* (1988) 45

Cal.3d 86, 129–130 [246 Cal.Rptr. 245, 753 P.2d 37].) Furthermore, defense counsel himself informed jurors during voir dire that life without parole meant exactly that, and the prosecutor's objection to that statement was overruled by the trial court.

■ The court did not err in permitting some jurors to be questioned about their views concerning the death penalty during the general voir dire. This practice is not improper. (See *People v. Davenport* (1995) 11 Cal.4th 1171, 1204 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Defendant contends that the questioning of some jurors about their views on the death penalty in the presence of the others tainted them, but fails to establish any specific prejudice. Defendant similarly fails to establish that the jury was "tainted" by Juror Carol S., who mistakenly had been dismissed and later was called back for general voir dire. Carol S. discussed her views on the death penalty in the presence of the other members of the panel and ultimately was excused because she would be unable to return a death verdict under any circumstances. Defendant's contention that other jurors who were present during the voir dire of Carol S. learned what answers to give in order to have themselves removed from the jury is pure speculation.

■ Defendant contends that sealing the juror questionnaires violated his, and the public's, right to a public trial. The instructions that accompanied the juror questionnaires informed the jurors that these documents would be used only by the court and lawyers and that they would be kept in confidence under seal after the jury was selected. Defendant's claim is forfeited by his failure to make any objection at trial to the handling of the questionnaires. (See *People v. Edwards* (1991) 54 Cal.3d 787, 813 [1 Cal.Rptr.2d 696, 819 P.2d 436] [a defendant may waive right to public trial by acquiescing in an order of exclusion]; *People v. Thompson* (1990) 50 Cal.3d 134, 157 [266 Cal.Rptr. 309, 785 P.2d 857] [right to public trial may be waived by failure to assert it in a timely fashion].)

Defendant also contends that the trial court erred in permitting jurors to take home the questionnaires in order to complete them. This claim is forfeited by defendant's failure to object on this ground at trial. In any event, defendant cites no authority to support this contention. Jurors were informed in writing that their answers to the questionnaire would have the effect of an answer given under oath and were directed by the judge to "fill out the questionnaire by yourself and not discuss it with anyone." Defendant points to nothing in the record indicating that any juror failed to abide by these instructions. We cannot discern how the procedure followed could have affected the impartiality of the jury. (See *People v. Stewart* (2004) 33 Cal.4th 425, 456 [15 Cal.Rptr.3d 656, 93 P.3d 271] [rejecting claim that Code Civ. Proc. § 223 required prospective jurors to complete the questionnaire in the presence of the other prospective jurors].)

### 3. Challenges to Juror Peter W.

Defendant makes a number of contentions related to the trial court's refusal to excuse Juror Peter W. or to grant defendant an additional peremptory challenge in order to excuse him. At the time Peter W. underwent general voir dire, defendant had used 19 of his 20 peremptory challenges. Peter W. worked for the county department of corrections. During voir dire, the prosecutor asked him whether he knew defendant. Peter W. replied that he was employed in the main jail, and that he believed defendant "stayed in the old building." The prosecutor then questioned him further concerning whether he had seen defendant at the jail. Defense counsel moved for a mistrial on the ground that the prosecutor improperly had informed the jurors that defendant was in custody. The court denied the motion for mistrial but, upon defendant's request, the court ordered the prosecutor not to delve any further into the juror's occupation "as it relates to the defendant."

Defense counsel asked for one additional peremptory challenge, "because there is contamination prejudice." The trial court denied that request as well. Defense counsel then challenged Peter W. for cause on the ground that the juror knew that defendant was in custody. Defense counsel questioned the juror further concerning whether the nature of his job might affect his ability to serve, and the juror indicated that it would not. During this questioning, Peter W. reconfirmed his earlier statements that he would be very cautious in making a decision that could result in a severe punishment. Defense counsel then explained to the judge that counsel faced a dilemma: he could either employ his last peremptory challenge to remove a juror who had a leaning against the death penalty, or retain him even though he was contaminated as a result of his knowledge that defendant was currently in custody. Defense counsel offered to stipulate to excuse the juror for cause. The prosecutor agreed to the stipulation for tactical reasons, but stated he did not believe the trial court had erred in its rulings. The trial court refused to accept the stipulation, stating that the juror was qualified and that there was no impediment to his service. Defense counsel employed his final peremptory challenge to excuse another juror, and Peter W. served on defendant's jury.

■ Defendant contends the trial court abused its discretion in refusing to accept the stipulation. Defendant asserts that the parties are entitled to stipulate to the excusal of a juror absent "extraordinary circumstances." Instead, "[a]ssessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court." (*People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103]; see Code Civ. Proc., §§ 225, subd. (b)(1) [specifying grounds for challenge for cause], 230

[challenges for cause shall be determined by the court].) Defendant has cited no authority suggesting a court is required to accept the parties' stipulation that a juror be excused for cause. (See *People v. Singh* (1932) 121 Cal.App. 107, 111 [8 P.2d 898] [court is not required to accept the parties' stipulation on issues of law].)

Defendant relies on the test established to determine whether parties who have settled a case while the appeal is pending are entitled to a stipulated reversal. (See *Neary v. Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119].) The standard established in *Neary* was based, in large part, on policies relevant to the settlement of civil actions—policies that are inapplicable in the present context. (See *Neary, supra,* 3 Cal.4th at pp. 277–280.)

"On appeal, we will uphold the trial court's decision if it is fairly supported by the record, and accept as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has given conflicting or ambiguous statements." (*People v. Farnam* (2002) 28 Cal.4th 107, 132 [121 Cal.Rptr.2d 106, 47 P.3d 988].) The court did not abuse its discretion in concluding that Peter W. was qualified to serve on defendant's jury. The juror did not have actual contact with defendant through his employment at the jail and expressed no opinion suggesting he could not be fair and impartial.[3]

Defendant contends that no deference is due the trial court's ruling, because Juror Peter W.'s employment as a corrections officer in the county jail system where defendant was housed constituted "implied bias"—a presumption of bias that could not be overcome by a finding that he could be

---

[3] With respect to this and virtually every other claim raised on appeal, defendant urges that the error or misconduct he is asserting infringed his constitutional rights to a fair and reliable trial. In most instances, to the extent defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears either that (1) the appellate claim is of a kind (for example, failure to instruct sua sponte, or erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, to the extent erroneous for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 435–438 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

In the latter instance, of course, our rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads us to reject the newly invoked constitutional "gloss" as well. No separate constitutional discussion is required concerning such claims, and we therefore provide none.

fair and impartial. Under California law, a juror may be excused for "implied bias" only for one of the reasons listed in Code of Civil Procedure section 229, "and for no other." (Code Civ. Proc., § 229.) If the facts do not establish one of the grounds for implied bias listed in that statute, the juror may be excused for "[a]ctual bias" if the court finds that the juror's state of mind would prevent him or her from being impartial. (Code Civ. Proc., § 225, subd. (b)(1)(C).)

None of the statutory grounds for a finding of implied bias is present in this case, and the trial court concluded that Peter W. was not actually biased. Defendant argues nevertheless that Peter W.'s position as a corrections officer and his knowledge that defendant was incarcerated rendered him unable to decide the case impartially, and that the failure to excuse him violated the Sixth Amendment's guarantee of a trial by an impartial jury. Defendant relies upon federal cases concluding that bias may be implied or presumed from the "potential for substantial emotional involvement" inherent in certain relationships. (*United States v. Allsup* (9th Cir. 1977) 566 F.2d 68, 71 [jurors should have been excused for cause from serving on case in which the defendant was charged with robbing a bank that employed them, even though they claimed they could be impartial]; see also *Fields v. Woodford* (9th. Cir. 2002) 309 F.3d 1095 [evidentiary hearing required to determine whether juror whose wife had been the victim of a crime quite similar to the ones charged was biased]; *United States v. Eubanks* (9th. Cir. 1979) 591 F.2d 513 [juror who had two sons who were serving long prison terms for murder and robbery committed in an attempt to obtain heroin should have been excused from serving in case in which the defendant was charged with conspiracy to possess and distribute heroin].) Even assuming these federal decisions are otherwise persuasive, we discern on the present record no potential for the type of "emotional involvement" that these cases found to be grounds for disqualification. Peter W. did not work in the part of the jail in which defendant was housed. The circumstance that he knew defendant was incarcerated did not render him unable to be impartial. (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 121 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1336 [65 Cal.Rptr.2d 145, 939 P.2d 259].)[4]

---

[4] Defendant also contends that the trial court should have excused Peter W. under former Code of Civil Procedure section 219, which exempted peace officers, as defined in section 832, subdivision (a), from jury service in criminal cases. Defendant concedes that Peter W. was not a "peace officer" within the meaning of Code of Civil Procedure section 219. (See § 831, subd. (a) [a custodial officer is a public officer, not a peace officer]; see also *County of Santa Clara v. Deputy Sheriffs' Assn.* (1991) 3 Cal.4th 873 [13 Cal.Rptr.2d 53, 838 P.2d 781].) Nevertheless, he argues that the statute denies due process and equal protection guarantees of the state and federal Constitutions by drawing an arbitrary and irrational distinction between peace officers and jailers. Because defendant did not raise Code of Civil Procedure section 219 in support of his challenge to Peter W. in the trial court, we decline to address that argument here.

Defendant also contends that the trial court abused its discretion in refusing to grant defendant's request for an additional peremptory challenge. To support a claim that he is constitutionally entitled to more peremptory challenges than are provided by statute, a defendant must establish "at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin, supra,* 46 Cal.3d 659, 679; see *People v. Pride* (1992) 3 Cal.4th 195, 231 [10 Cal.Rptr.2d 636, 833 P.2d 643] [additional peremptory challenge not required when the defendant did not demonstrate that the trial court erroneously denied challenges for cause and none of the allegedly biased prospective jurors actually served on the jury].) Other than the meritless contention that Peter W.'s employment at the jail was ground for disqualification, defendant suggests no reason that an additional peremptory challenge was necessary in order to avoid an unfair trial. Defense counsel argued that he needed the additional challenge because the jury panel was tainted by the information that defendant was in custody, but any such bias could have been addressed through an appropriate admonition, had one been requested.

### 4. *Denial of challenges based on jurors' views concerning the death penalty*

Defendant contends that the trial court erred in denying eight challenges to jurors under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. "A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause . . . ." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].) "If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 896–897 [22 Cal.Rptr.3d 305, 102 P.3d 228].) Under this deferential standard of review, we find no error. The trial judge concluded that each of the prospective jurors at issue (none of whom ultimately served on the jury) would follow the court's instructions and consider the relevant circumstances before making a decision. As we explain below, the trial court's conclusions are supported by the record.

#### a) *George C.*

George C. initially stated that he was "pretty much noncommittal" concerning the appropriate penalty and would not favor the defense or the prosecution. He also stated, however, that he would not give much weight to

a defendant's background, psychiatric evidence, age, childhood abuse, drug use, or testimony from family members, as long as the person knew right from wrong. Although he would not afford such evidence much weight, he would consider it. And, he stated, he would follow the court's instructions and, if persuaded by the evidence, could return a verdict of life imprisonment without possibility of parole. The trial court properly disallowed the challenge. The court noted that although the prospective juror was somewhat unwilling to give weight to particular mitigating factors, he was not asked about other mitigating and aggravating factors, and the juror's decision is based on "the final evaluation of all the circumstances." The prospective juror never stated he would vote for the death penalty without regard to mitigating evidence, but merely expressed his view that certain types of evidence were not entitled to much weight in the penalty decision.

### b) *Glenn H.*

Glenn H. stated several times that he definitely would vote for the death penalty if a deliberate, premeditated murder were proved. On his questionnaire he indicated that anyone who intentionally kills another person automatically should receive the death penalty and that he would not be willing to give weight to defendant's background. He stated, however, that if he were instructed that he must consider other evidence, he would follow the instructions. In that circumstance, he stated he would not automatically vote for death, but the mitigating evidence would have to be "very overwhelming" to cause him to change his opinion. Childhood beatings, alcohol or drug problems, and mental problems short of insanity would not affect his decision. He said he would consider other mitigating evidence, including whether defendant was dominated by someone else, acted under duress, or was a minor participant in the crime and, if persuaded, could vote for life imprisonment without possibility of parole. Defense counsel challenged Glenn H. for cause on the ground that the only mitigating factors he was willing to consider were ones that were not relevant to the case. The court properly disallowed the challenge, stating that it believed the juror would follow the law and would consider both penalties before arriving at a decision. Despite the personal opinions he asserted at the beginning of voir dire, this prospective juror stated he would consider the mitigating evidence as required by the court's instructions and could vote for life imprisonment without possibility of parole if persuaded that was the appropriate penalty.

### c) *James L.*

James L. stated that a person who commits a murder should receive the death penalty and that he would automatically vote for the death penalty if he were convinced that an intentional murder had been committed. He also

stated, however, that this was only his opinion—he would follow the law, keep an open mind, and consider both penalties. When questioned by defense counsel, James L. confirmed that he would automatically vote for the death penalty for an intentional, cold-blooded murder. But after the prosecutor and the court further explained his obligations under the law, he indicated he would keep an open mind and would seriously consider both penalties. The trial court properly denied defense counsel's challenge for cause. The prospective juror acknowledged that his initially stated views were only his personal opinion and that he would follow the law requiring him to consider both penalties.

### d) *John V.*

On his questionnaire, John V. wrote that a person who intentionally killed someone who had done nothing to harm the killer always should receive the death penalty. If faced with an intentional killing during a robbery or the killing of a witness, and there was no other relationship between the killer and the victim, he believed the death penalty always should be imposed. Information concerning defendant's background would not, he stated, carry much significance. He also stated, however, that he would follow the law as instructed and keep an open mind, and if the evidence warranted it he could vote for life imprisonment without possibility of parole. He felt that he would vote for the death penalty, but conceded it was possible that upon learning more facts he might change his mind. The trial court properly disallowed defense counsel's challenge for cause, stating it appeared the juror was "ambivalent at the moment and would follow the law and the evidence as given in the case."

### e) *Jean A.*

Jean A. believed in the death penalty and doubted that life imprisonment without possibility of parole truly was carried out. But she did not lean strongly toward the death penalty and thought her ultimate decision would depend on the case and the circumstances. She considered herself an opinionated person and stated it would take a lot to sway her—the burden would be on the defense to convince her of extenuating circumstances. At the penalty stage, she could wait until she heard all the evidence before making a decision. She explained she would try to keep an open mind, although she would find it difficult to be fair to both sides because she has very strong feelings against violence and would find it difficult to be lenient. She did not believe that anyone who intentionally kills should be sentenced to death automatically because, she conceded, there might be extenuating circumstances. She thought she could keep an open mind and listen to whatever extenuating circumstances were presented at the penalty phase, including

psychological testimony. Defense counsel challenged her for cause. The court found the challenge to present a close question because Jean A.'s answers fluctuated, but ultimately concluded the prospective juror would follow the court's instructions, and hence the court disallowed the challenge. In view of the prospective juror's conflicting responses, we defer to the trial court's conclusion that she could follow the law.

### f) Gary M.

Gary M. had been the victim of a robbery in 1982, during which the robber attempted to shoot him. He stated that he had considered whether his being shot at might be a reason to excuse him from the case, but that he was trained in science and followed the scientific method; he felt he would be willing to follow the rules and decide the case in accordance with the evidence. He stated that if the killing were intentional and committed with a gun, he felt the death penalty should be automatic, but later clarified that he would have to know the circumstances and hear the instructions on the law. If the judge told him he was to consider defendant's background and the circumstances of the crime in deciding the appropriate penalty, and to keep an open mind, he would follow those instructions and put aside his personal beliefs. Defense counsel challenged Gary M. for cause based upon his stated views regarding the death penalty and the fact that he had been shot at during a robbery. The court properly disallowed the challenge, stating that the juror was in "the category of those who would favor the death penalty but would not impose it in every case."

### g) Harley R.

Harley R.'s brother had been the victim of a robbery in 1984, during which he was beaten with a gun and sustained serious injuries. When questioned concerning whether that event would have any effect upon him if he served on the case, the prospective juror stated he believed he could keep an open mind. He believed the death penalty always should be imposed if a person murders in order to cover up a crime and that a person's background should not carry strong weight if the person knew right from wrong. Although it would be very difficult to convince him not to vote for the death penalty, it was possible he could be swayed and could set aside his personal feelings, follow the law, keep an open mind, and consider all of the mitigating factors. The court properly disallowed the challenge for cause, finding that the prospective juror favored the death penalty but would not vote to impose it in every case.

### h) Kathryn R.

Kathryn R. stated she believed a person who deliberately killed should be put to death, in spite of any background or mitigating evidence that might be

presented. She had a sister whose boyfriend had been beaten to death with a crowbar during a gas station robbery. She stated that this incident might have an effect on her because the person who committed the offense was only lightly punished and she was displeased with that outcome. At one point she stated she was unsure whether she could set aside her personal views concerning the death penalty. After the law and the procedures were explained to her, however, she indicated she would want to know defendant's background and "would hope" she could keep an open mind and listen to all the evidence. She could vote for life imprisonment without the possibility of parole "if it was really strong evidence." She explained she did not believe drug and alcohol use would constitute such evidence, but a brutal childhood might hold more weight. It would be difficult but she would attempt to put aside her personal feelings concerning the death penalty. Defense counsel challenged her for cause, but the trial court properly disallowed the challenge. Although her answers were equivocal, the trial court did not abuse its discretion in concluding she would be willing to follow the law and consider both possible penalties.

### 5. *Implied bias*

Defendant additionally contends that the trial court erred in denying challenges for cause to four prospective jurors—three of those discussed above (Gary M., Harley R., and Kathryn R.) and a fourth, Gary Mc.[5]—based on their asserted "implied bias." Gary Mc. had been the victim of a robbery and shooting. Harley R.'s brother had been the victim of a robbery, during which the brother was seriously injured. Kathryn R.'s sister had a boyfriend who was beaten to death during a gas station robbery. Gary Mc. had two friends in law enforcement who were killed on the job. We apply the same standard of review to challenges for cause based upon a prospective juror's bias as we do to challenges based on the juror's views concerning the death penalty. "If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning, supra,* 34 Cal.4th at pp. 896–897.)

Jurors Gary Mc., Harley R., and Kathryn R. were challenged during the *Hovey* voir dire, and all of the circumstances indicate that the challenges were based upon their views concerning the death penalty—including the impact of their personal experiences on those views—and not on any alleged inability

---

[5] Defendant also asserts that juror Gary Mc. should have been excused under *Wainwright v. Witt, supra,* 469 U.S. 412, but defendant did not challenge Gary Mc. in the trial court on the basis of his views concerning the death penalty, and defendant provides no justification for this claim other than the fact that Gary Mc. had two friends in law enforcement who were murdered on the job.

to be impartial regarding guilt or innocence. Thus, the challenges to these jurors have been fully addressed above.

Defense counsel did challenge Gary Mc. for cause based upon his relationship with law enforcement. Gary Mc. had been a deputy sheriff. He had been the victim of a violent assault when he worked as a park ranger and had two friends in law enforcement who had been murdered. He stated he did not believe that experience would have any effect upon his ability to consider fairly the appropriate penalty in this case. During the general voir dire, when defense counsel questioned him extensively about his relationship with law enforcement and whether he could be fair if questions were raised regarding the credibility or performance of a police officer, Gary Mc. insisted he would maintain an open mind. He stated he could be impartial and listen to the testimony of all witnesses fairly and would not be prejudiced for or against any officer. This record supports the trial court's conclusion that Gary Mc. could be a fair juror.[6]

As he did in relation to the challenge to Juror Peter W., discussed above, defendant argues that bias should be presumed on the basis of these jurors' experiences with violent crime, relying upon federal cases concluding that bias may be implied or presumed from the "potential for substantial emotional involvement" inherent in certain relationships. (See, e.g., *United States v. Allsup, supra,* 566 F.2d at p. 71; see also *Fields v. Woodford, supra,* 309 F.3d 1095; *United States v. Eubanks, supra,* 591 F.2d 513.) Even assuming, as discussed above, that such decisions are persuasive, these four potential jurors' experiences with violent crime were unconnected to the present case and were not sufficiently similar to create the type of "emotional involvement" that these cases viewed as a ground for disqualification.

6. *Exclusion of jurors from guilt phase under Witt*

Defendant argues he was deprived of due process by the exclusion of jurors from the guilt phase of his trial because of their stated inability to impose the death penalty. He invites us to reconsider our contrary conclusion in *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. We continue to adhere to that decision, in which we held that the exclusion of jurors who could not consider imposing the death penalty from serving on the guilt phase of a capital trial was justified by the "interest of the state in

---

[6] Defendant also contends the trial court should have excused Gary Mc. on the ground he was a "peace officer" and was therefore ineligible to serve under Code of Civil Procedure section 219. Defendant failed to raise this objection at trial, but in any event the record does not support his assertion. Gary Mc. was a reserve deputy sheriff. As such, he had the powers of a peace officer only when specifically assigned to duty. (§ 832.6.) The record does not establish that Gary Mc. had the powers of a peace officer at the time of defendant's trial.

maintaining a unitary jury for both phases of the trial." (*Id.* at p. 353; see *People v. Wader* (1993) 5 Cal.4th 610 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

### 7. Batson-Wheeler *issues*

Defendant contends the prosecutor employed peremptory challenges to excuse Hispanic jurors on the basis of race, in violation of his state and federal constitutional rights. (See *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].) After the prosecutor employed one of his few remaining peremptory challenges to excuse a Hispanic-surnamed juror, defense counsel objected on the ground the prosecutor was exercising peremptory challenges on the basis of race. After asking for and receiving the prosecutor's explanation for excusing that juror and four other Hispanic jurors, the trial court ruled that each reason given by the prosecutor was sufficient.

■ Defendant contends the trial court erred in so concluding and that the prosecutor's reasons for excusing Prospective Jurors Norma R., Jimmy B., Frank F., and Irene H. were contrived. The United States Supreme Court recently reiterated the applicable legal standards. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted.) This court gives "great deference to the trial court in distinguishing bona fide reasons from sham excuses." (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521].) As explained below, the record supports the trial court's conclusions that each of the jurors at issue was excused for valid, race-neutral reasons.

### a) *Norma R.*

The prosecutor explained that, among other reasons, he excused Norma R. because she did not know whether she could vote for the death penalty. Although she stated generally that she supported the death penalty for someone who kills intentionally, she repeatedly expressed uncertainty whether she actually could cast a vote for that punishment as a juror. The prosecutor questioned her intensively on this subject, as did defense counsel. Ultimately, she stated she thought she could make the decision, and the trial

court denied the prosecutor's challenge for cause. The record amply supports the trial court's conclusion that the prosecutor had an acceptable, race-neutral reason for excusing this juror. A juror's reluctance to impose the death penalty, even if insufficient to justify a challenge for cause, is a valid reason for a prosecutor to exercise a peremptory challenge. (See *People v. Johnson* (1989) 47 Cal.3d 1194, 1222 [255 Cal.Rptr. 569, 767 P.2d 1047].)

### b) *Frank F.*

Similarly, the prosecutor explained that he excused Frank F. because he indicated that the prospective juror would impose the death penalty only for multiple murders. Although he stated he could vote for the death penalty if he were convinced it was appropriate, Frank F. asserted several times that he would impose that punishment only if it were shown that the perpetrator enjoyed killing and killed repeatedly. The prosecutor noted that when asked a question calling for a yes-or-no answer, Frank F. stated he could vote to impose a death sentence, but that whenever he was asked a question calling for him to express his own views he indicated he would expect facts showing multiple murders, or someone who enjoyed killing, before he could vote to impose a death sentence. In addition, he described his feelings concerning the death penalty in general as neutral, and expressed the opinion that life imprisonment without possibility of parole was the harsher sentence. The prosecutor's stated reason was valid. (See *People v. Johnson, supra,* 47 Cal.3d at p. 1222.)

### c) *Jimmy B.*

Jimmy B. had been convicted of brandishing a weapon and of driving under the influence. The prosecutor explained that Jimmy B. had suffered the second highest number of convictions of any potential juror, and the prosecutor also had excused the one prospective juror who had more convictions. Jimmy B. also had several family members who were heroin addicts and a brother who was confined in prison. He checked a questionnaire box indicating he was "very liberal"; he had not given much thought to the death penalty; and at one point he indicated he would require a showing of multiple murders before imposing the death penalty. These reasons are adequate, particularly when viewed in combination. "[A] party may decide to excuse a prospective juror for a variety of reasons, finding no single characteristic dispositive." (*People v. Gray* (2005) 37 Cal.4th 168, 189 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

### d) *Irene H.*

The prosecutor stated he lacked confidence in Irene H. He felt she was not very bright, and he was concerned about discrepancies between some of her

questionnaire answers and responses she gave during oral voir dire. In the prosecutor's opinion, the prospective juror also appeared to be predisposed toward defense counsel. The prosecutor believed Irene H. might have been an acceptable juror under some circumstances, but she was not a leader, and at the time he excused her the group appeared to be lacking in leadership. We recognized the validity of this type of strategic decision in *People v. Johnson, supra,* 47 Cal.3d at page 1220: "If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain."

Defendant contends the trial court erred by applying the standards set out in *People v. Johnson, supra,* 47 Cal.3d 1194, and by not comparing the responses of the jurors not stricken by the prosecutor with those of the Hispanic jurors he did strike, in evaluating the good faith of the prosecutor. Defendant did not request that the trial court engage in such an analysis, but argues that we should do so on appeal. In *Johnson,* we held that a reviewing court is not required to engage in a comparative analysis of jurors. Assuming without deciding that the United States Supreme Court's decision in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*) requires us to perform an analysis comparing jurors the prosecutor excused with those he or she did not excuse, we conclude that the comparative analysis relied upon by defendant fails to demonstrate purposeful discrimination.

In *Miller-El,* the high court stated that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El, supra,* 545 U.S. at p. 241 [125 S.Ct. at p. 2325].) That analysis does not provide a basis to doubt the trial court's findings in the present case, however, because the examples of "comparative" jurors cited by defendant are not truly comparable to those whom the prosecutor excused. For example, the circumstance that the prosecutor did not strike some jurors who had received traffic citations for speeding does not call into question the validity of his explanation that he excused Jimmy B. because that prospective juror had convictions for brandishing a weapon and driving under the influence (which was only one of several reasons given by the prosecutor).

Defendant contends the procedures employed by the trial court were improper in that the court ruled one at a time on the propriety of each of the prosecutor's reasons for excusing the prospective jurors, rather than ruling on the basis of the totality of the circumstances after all of the explanations had been given. Defendant complains that this procedure deprived defense counsel of the opportunity to argue, based on all of the circumstances, that the prosecutor was discriminating against Hispanics, and that the trial court did not make a meaningful and sincere determination concerning the prosecutor's intent.[7] Even if it might have been better practice for the trial court to withhold its ruling until hearing all of the prosecutor's reasons, we find no basis for concluding that its ruling might have been different had it done so. The trial court did not deny defense counsel the opportunity to argue, and defendant does not point to any circumstances in the record that would support the conclusion that the prosecutor was discriminating unlawfully in his use of peremptory challenges despite the apparently valid, race-neutral reasons he provided.

### 8. *Prosecutor's conduct*

Defendant contends the prosecutor engaged in a continual pattern of misconduct during the voir dire proceedings, violating defendant's right to a fair trial under the state and federal Constitutions. In essence, he complains that the prosecutor accused defense counsel of misconduct in the presence and hearing of prospective jurors, leading to frequent heated exchanges and reciprocal accusations between the two attorneys. For example, the prosecutor complained that defense counsel was interrupting him and engaging in distracting conversation at the counsel table, stated that defense counsel's answer to a juror's question was incorrect and unfair, and accused defense counsel of "grandstanding."

Defendant did not object to most of the prosecutor's comments, and to that extent the claim is forfeited. In any event, the contention is without merit. A prosecutor's conduct violates the Constitution only when it is " ' "so

---

[7] Defendant also complains that the trial court improperly suggested a race-neutral reason for the prosecutor's decision to strike Judy P. Before the prosecutor gave his reason, the trial court volunteered that the prospective juror was a "borderline case," the same expression the court had used in denying the prosecutor's challenge for cause against her based upon her views concerning the death penalty. Although it is not the trial court's role to supply reasons to the prosecutor, in this case the trial court merely stated the obvious. The views expressed by Judy P. during voir dire made it clear that the prosecutor would not find her an acceptable juror. Indeed, defendant does not even attempt to argue on appeal that the prosecutor lacked a valid, race-neutral reason for excluding her. Under these circumstances, we find no merit in defendant's contentions that the trial judge's comment violated its duty to fairly and impartially consider the validity and sincerity of the prosecutor's proffered reasons and that the court influenced the prosecutor to provide similar, but sham, reasons for excusing other jurors.

egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; see *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Conduct that does not rise to the level of a constitutional violation will constitute prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*Espinoza, supra*, 3 Cal.4th at p. 820.) In the present case, both counsel engaged in a pattern of aggressive advocacy and mutual expressions of antagonism, which caused the trial court to admonish them frequently. Although the prosecutor at times might have conducted himself in a more restrained manner, we do not find that any of these incidents, considered singly or in combination, amount to prejudicial misconduct.

Defendant did object and requested a mistrial when the prosecutor asked Prospective Juror Peter W., who worked at the county jail, whether he ever had seen defendant there. The trial court sustained the objection and directed the prosecutor not to pursue that line of questioning. Defendant contends the prosecutor's voir dire of Peter W. deliberately was designed to inform other jurors that defendant was in custody and thereby undermine the presumption of innocence. We find no misconduct. Whether Peter W. had contact with defendant was a legitimate subject of inquiry on voir dire. As we have observed, "the mere fact that the jury is made aware of a defendant's custodial status does not deprive the defendant of his constitutional rights." (*People v. Valdez, supra*, 32 Cal.4th 72, 121.) "[I]n certain circumstances a jury inevitably will learn a defendant is in custody for the current charged offense, for example where the jury is presented with the testimony of a jailhouse informant." (*People v. Bradford, supra*, 15 Cal.4th 1229, 1336 [prosecutor did not commit misconduct in eliciting responses from a witness about her continuing contacts with the defendant, from which the jury could have inferred he was in custody].) Furthermore, the trial court sustained defendant's objections, and defendant did not request the court to admonish the jury to ignore the fact that defendant was in custody.

### C. *Use of Material from Defendant's First Trial*

#### 1. *Testimony that defendant had been on death row*

Defendant contends the trial court erred in failing to declare a mistrial after a prosecution witness, during cross-examination, mentioned that defendant had been on death row. When defense counsel was questioning Jona Cardona about conversations she testified she had with defendant, she stated, "He

called me when he was on death row." Although the witness's statement did not reveal to the jury that defendant had been on death row as a result of prior proceedings in this same case, defense counsel subsequently revealed that circumstance. Counsel asked the witness, "Did you not learn that Mr. Ledesma was previously convicted and went to death row in this case because he was incompetently represented, that his attorney was on drugs and gambling during the trial, and because of that the Supreme Court ruled that he had an unfair trial and that's why we are back today?" The witness replied that she did not know, although she might have read about it in the papers. Counsel further asked, "And you learned, did you not, that he had gone to death row or been sentenced because he had an attorney who did no investigation, put on a false defense to the court, himself, was on PCP and other drugs during trial, and was addicted to gambling . . . ." The prosecutor objected to that question, and the court sustained the objection. When questioning resumed, defense counsel referred once again to calls that defendant had made to the witness "during those many years that he sat on death row."

A few minutes later, outside the presence of the jury, defense counsel moved for a mistrial. He argued the prosecutor was responsible for the witness and should have told her in advance not to mention defendant's having been on death row. Once that information was revealed, defense counsel tried to minimize the prejudice by trying to explain the reason for the new trial, but was stopped by the court when it sustained the prosecutor's objection. Defense counsel argued that no admonition the court could give would erase this from the minds of the jurors. The prosecutor explained that he did admonish this witness not to mention the previous trial.

The trial court denied the motion for mistrial, noting that it was defense counsel's question that indicated that defendant was on death row *as a result of prior proceedings in this same case.* Defense counsel made a strategic decision to avoid juror speculation concerning whether defendant had committed another murder and to attempt to mitigate the damaging effects of this information by explaining to the jury that defendant previously had been convicted of the same offense for which he now was being tried but that he had not had an adequate defense at his previous trial.

Although objections had been sustained to counsel's questions to Cardona about the prior trial, it was subsequently made clear through other witnesses that defendant's prior trial was for the same offense and that prior defense counsel had not conducted a thorough defense. For example, when the prosecution attempted to impeach defense witnesses who testified about defendant's drug use on the grounds that they had not mentioned the subject in the prior trial, defense counsel brought out the circumstance that the prior

defense attorney had not questioned them on the subject. One of the defense experts, Dr. Evans, testified that prior defense counsel did not have psychological tests of defendant performed. Prosecution witness Dr. Glathe testified under cross-examination that he had performed only the brief examination of defendant that prior defense counsel had asked him to perform, and that the results of tests that had been performed subsequently would have been helpful in assessing defendant.

The issue here is whether the witness's comment was so incurably prejudicial that a new trial was required. "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice. (See *People v. Wharton* (1991) 53 Cal.3d 522, 565 [280 Cal.Rptr. 631, 809 P.2d 290] [motion for mistrial properly was denied because court's admonition and witness's later testimony under cross-examination dispelled prejudice]; *People v. Rhinehart* (1973) 9 Cal.3d 139, 152 [107 Cal.Rptr. 34, 507 P.2d 642] [witness's inadvertent answer was insufficiently prejudicial to justify a mistrial].) But we do not presume that knowledge that a defendant previously has been convicted and is being retried is incurably prejudicial. (See *People v. Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107] [claim that trial court improperly disclosed to jury that the defendant previously had been sentenced to death for the same offense was waived by counsel's tactical failure to object, and was not prejudicial].)

In the present case, the length of time between the crime and the trial and the numerous unavoidable references to witnesses' prior statements created a high risk that the jury would become aware that defendant had been tried previously. As the high court has recognized, "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (*Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 102 S.Ct. 940] [verdict did not deny due process, even though one juror had applied for employment with the prosecutor's office during the trial, absent showing of actual bias].) We find no basis for concluding, on the present record, that the knowledge that defendant previously had been convicted of murder and sentenced to death was incurably prejudicial.

Furthermore, defense counsel made a strategic decision to inform the jury that defendant previously had been convicted of the same offense, rather than a different crime, and that his conviction was reversed because of the

inadequate defense provided by his attorney. Counsel's approach appears to be an appropriate attempt to minimize damage and speculation, particularly in light of the circumstance that the jury inevitably would learn that defendant had been on death row if the case went to a penalty phase.[8]

 Defendant argues that the jury's knowledge that the first jury had convicted him for the same offense was prejudicial not only because it may have influenced the jury's verdict directly, but also because it enhanced the credibility of prosecution witnesses Michael Shay, Floyd Cowdell, and Sylvia Ontiveros, who had testified at the first trial and whose testimony apparently had been accepted by the first jury. The jury was given the standard instruction, "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source." We presume the jury followed that instruction.[9] There is no reason to believe that the jurors, who observed each of these witnesses, felt compelled to ignore the court's instruction and defer to the judgment of a different jury that resulted from a different trial. Under these circumstances, we conclude that the witness's comment did not require a mistrial.[10]

## 2. *Defendant's prior testimony*

Defendant contends the trial court erred in refusing to grant a mistrial after the prosecutor referred to defendant's false testimony at his first trial during

[8] On the present record, we cannot conclude that defense counsel's decision to proceed in this manner was unreasonable, and we therefore reject defendant's claim that his attorney rendered constitutionally ineffective assistance in choosing this strategy rather than immediately requesting that the jury be admonished to ignore the comment. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 104 S.Ct. 2052].) Whether it was preferable to leave the jury to speculate that defendant had been convicted and was under a death sentence for another murder the jury knew nothing about, or instead permit the jury to become aware of the circumstances that led to his being retried and rely upon the jurors to do their duty and decide the case solely on the evidence before them, is a matter upon which reasonable counsel might differ. Under such circumstances, we decline to second-guess the strategic decisions of defense counsel. (See *Ledesma I, supra,* 43 Cal.3d at p. 216.)

[9] During the presentation of the evidence, defense counsel asked the court to instruct the jury that defendant's prior conviction had been reversed because of the ineffective assistance provided by his counsel, but the court declined, commenting, "If they are not aware of it by this time they must have been asleep." At the penalty phase, the court specifically instructed the jury that defendant was being retried as the result of the decision by this court that his previous trial was unfair, and that the jury was to "disregard completely the result of that first trial in deciding upon a verdict in the present trial." No similar instruction was requested at the guilt phase.

[10] Defendant additionally contends his counsel rendered constitutionally ineffective assistance in failing to seek a protective order to preclude Jona Cardona and other witnesses from informing that jury that defendant had been on death row. Defendant has not established that the result at his trial would have been different had such an order been obtained. The prosecutor stated that he admonished the witness not to bring up the first trial, and nothing in the record suggests she did so intentionally.

cross-examination of defense witnesses. Testifying at his first trial, defendant denied committing the robbery or murder, claiming that on the day of the gas station robbery he had loaned his motorcycle to two friends, who later told him *they* had committed the robbery. At the retrial, the prosecutor asked defense expert Dr. Evans whether she had reviewed defendant's prior testimony. When defense counsel objected, the court asked the prosecutor, in the presence of the jury, whether he would be getting into defendant's testimony. At that point, the court conducted a bench conference and directed the prosecutor not to pursue that line of questioning.

Subsequently, the prosecutor asked defense witness Dr. Rosenthal whether defendant had admitted to him that he previously lied in court about this matter. Dr. Rosenthal did not directly answer but instead attempted to clarify the question. After the court overruled defense counsel's objection, the prosecutor asked whether Dr. Rosenthal was comfortable relying upon information provided by a man who admitted that he lied in court. The court sustained defense counsel's objection.

Thereafter, defense counsel moved for a mistrial on the grounds that the prosecutor's question denied defendant a fair trial and violated the trial court's prior ruling (in the context of the examination of Dr. Evans) that defendant's prior testimony was inadmissible. The prosecutor argued that the question was based on Dr. Rosenthal's notes, which indicated that defendant told him he had lied at the first trial. The court denied defendant's motion for mistrial, concluding there was no misconduct by the prosecutor and no prejudice.

Defendant contends his testimony at his first trial was inadmissible at his second trial because it was a direct result of the ineffectiveness of his first attorney. (See *People v. Karlin* (1964) 231 Cal.App.2d 227, 232 [41 Cal.Rptr. 786] [trial court erred in admitting at trial a confession the defendant made at his preliminary hearing, because his attorney had a conflict of interest that prevented her from providing effective assistance and the defendant's testimony at the preliminary hearing "was the product of the failure to honor his constitutional right to adequate legal representation"].) In our prior opinion, we upheld the referee's conclusion that Attorney Parrish "took an active part in the decision to use, and in preparation of, the alibi defense." (*Ledesma I, supra*, 43 Cal.3d at p. 221.) The decision to present the false alibi derived from Parrish's ineffective assistance in failing to undertake adequate investigation and research, especially with regard to the issue of diminished capacity.

We need not decide whether or not the prosecutor's reference to defendant's prior testimony was a proper means of impeaching the defense's expert

witnesses because, even assuming for the purposes of discussion that it was not, defendant has not shown that the prosecutor's questions caused prejudice that was "incurable by admonition or instruction." (*People v. Haskett, supra,* 30 Cal.3d at p. 854.) As noted earlier, "[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*Ibid.*)

Defendant's objections were sustained by the trial court, and neither witness answered the questions. The jury did not hear specific evidence about what defendant said in his prior testimony. Defense counsel did not request the court to admonish the jury to ignore the question and, in any event, the jury was instructed that questions are not evidence. Furthermore, because defendant did not testify at the second trial, the defense case did not rest upon his credibility. The jury heard other evidence that suggested defendant was not always truthful; indeed, the defense theory was that he made numerous false admissions about his participation in the crime. Under these circumstances, we cannot conclude that the prosecutor's brief reference to defendant's lying in his prior testimony was so prejudicial as to require a mistrial.[11]

### 3. *Use of prior testimony to impeach defense witnesses*

Defendant contends the prosecutor improperly was permitted to impeach defense witnesses Adelita Jordon, Pasqual Ledesma, and Ruben Gomez with their testimony at the previous trial. Defendant asserts the prosecutor's ability to impeach these witnesses is attributable to Attorney Parrish's ineffective assistance. In *Ledesma I*, this court concluded that Attorney Parrish had failed to investigate adequately a diminished capacity defense based upon defendant's drug use. (*Ledesma I, supra,* 43 Cal.3d at p. 223.) As a result of this failure, the witnesses did not testify at the first trial concerning defendant's drug use. Subsequently at the retrial, the prosecutor was able to use these (and other) omissions and inconsistencies between their earlier testimony and their current testimony to imply that their current testimony was fabricated.

Defendant cites no authority establishing an absolute bar to the prosecution's use of testimony from a previous trial at which defendant received ineffective assistance of counsel. Rather, decisions that have addressed such issues have examined the circumstances surrounding the prior testimony and how it was used in the subsequent trial, to determine whether

---

[11] Defendant also asserts the trial court erred in ruling that his prior testimony could be admitted for impeachment purposes if he testified in a manner inconsistent with that prior testimony, and that this error denied him his rights to effective assistance of counsel and to testify in his own defense under the Fifth, Sixth, and Fourteenth Amendments and article I, sections 7 and 15 of the California Constitution. The record demonstrates, however, that no such ruling was made with respect to the guilt phase of the trial.

the evidence at issue is attributable to counsel's ineffective assistance and whether its use denied the defendant a fair trial in the subsequent proceeding. (See, e.g., *People v. Sixto* (1993) 17 Cal.App.4th 374 [21 Cal.Rptr.2d 264] [upholding trial court's denial of motion for certain findings and for exclusion of evidence as means of curing effect of ineffective assistance of counsel at prior trial]; *People v. Karlin, supra,* 231 Cal.App.2d 227 [the defendant's admissions made at preliminary hearing, when his attorney had a conflict of interest, could not be used at his subsequent trial]; see also *Ibn-Tamas v. United States* (D.C. 1979) 407 A.2d 626 [the defendant's testimony at first trial, after which a mistrial was declared due to ineffective assistance of counsel, could be used at second trial only for impeachment purposes]; *People v. Duncan* (1988) 173 Ill.App.3d 554 [527 N.E.2d 1060, 1062, 123 Ill.Dec. 422] [because ineffective assistance of counsel "colored the entire proceeding," the defendant's testimony at first trial could not be used in second trial except for purposes of impeachment].)

Even if the failure of these witnesses to testify at the first trial concerning defendant's drug use may be attributed to prior counsel's ineffective assistance, we do not find that the use of their prior testimony for impeachment purposes denied defendant a fair trial. Defense counsel had a full opportunity to rehabilitate these witnesses and to permit them to explain discrepancies between their prior testimony and their subsequent testimony. Adelita Jordon testified for the defense that after she and defendant separated, he began using PCP and there was a substantial change in his behavior. She remembered that when she served him with marital dissolution papers, he was very shaky and did not make sense. The prosecutor cross-examined her regarding her prior testimony that when defendant came to visit her and her daughters he was polite and pleasant, that she did not recall whether defendant appeared to be under the influence of drugs at the time she served him, and that he appeared to be "straight" on other occasions when she saw him at her mother's house. When asked about these discrepancies, she said she had been nervous at the prior trial. On redirect examination, she testified that at the previous trial defense counsel did not ask her anything about defendant using drugs and he did not ask her whether he was acting strange.

The prosecutor questioned witness Ruben Gomez concerning why he had not mentioned in his previous testimony that Jona Cardona told him in 1979 that she heard defendant did not commit the murder and that someone named "Crazy Joe" had done so. On redirect examination, Gomez testified that at the first trial defendant's lawyer asked Gomez only a few questions concerning whether defendant was a nice person and did not ask him about drug use. Gomez also explained that he had heard many rumors concerning whether defendant had committed the crime, and that the conversation with Jona Cardona stood out in his mind only because she now had become a witness in the case and had testified differently from what she told him back in 1979.

Furthermore, Gomez testified, he mentioned the conversation as soon as defense counsel told him she was a witness.

Defendant's brother Pasqual Ledesma testified he never had seen defendant use drugs but he had observed him acting as if he were in a daze, out of contact with reality, and in a state in which he just was not himself. The prosecutor cross-examined defendant's brother concerning his prior testimony, in which he stated he had not seen defendant under the influence of drugs but had only heard rumors about his drug use. Pasqual responded that, not being an expert in such matters, he did not necessarily know whether his brother was under the influence of drugs and that he had not been asked at the prior trial whether his brother seemed to be out of contact with reality. On redirect examination, Pasqual further testified that since defendant's first trial, Pasqual had learned more about drug use and had thought more about his brother's behavior.

As demonstrated above, each of these witnesses was able to provide plausible explanations for omissions from their testimony at the first trial, including prior defense counsel's failure to develop the issue. Under these circumstances, prior counsel's ineffective assistance did not deny defendant a fair retrial.

### D. *Testimony of Dr. Glathe*

#### 1. *Privileges*

Defendant contends the admission of the testimony of psychiatrist Dr. John P. Glathe regarding statements made to him by defendant violated the attorney-client and psychotherapist-patient privileges and defendant's Sixth Amendment right to counsel. Prior to defendant's first trial, the court appointed Dr. Glathe at the request of defense counsel. The appointment was made under Evidence Code section 1017, which provides that the psychotherapist-patient privilege applies when the psychotherapist is appointed by the court to advise the defendant's lawyer regarding defendant's emotional or mental condition for purpose of determining whether to raise insanity or some other mental defense. (See *Ledesma I, supra,* 43 Cal.3d at p. 179.) No type of mental defense was presented at defendant's first trial, and Dr. Glathe did not testify at that trial. (*Ibid.*)

In the subsequent habeas corpus proceeding, one of the claims made by defendant was that his trial attorney, Mr. Parrish, failed to research adequately the facts and the law regarding the availability of a diminished capacity defense. The referee who conducted the habeas corpus hearing ordered defendant, over his objection, to provide to the prosecution Dr. Glathe's

report and notes. At the hearing on the habeas corpus petition, the prosecution called Dr. Glathe as a witness, and his report was admitted into evidence. (*Ledesma I, supra,* 43 Cal.3d at p. 194, fn. 5.) The report does not mention any confession by defendant, but Dr. Glathe testified at the hearing that defendant told him he had committed the charged offenses. (*Id.* at p. 205.)

One of the defense experts, Dr. Evans, testified at the present trial that she had read portions of the transcripts of the hearing in the habeas corpus proceeding as well as this court's decision in *Ledesma I.* That decision quotes the full text of Dr. Glathe's report and includes a summary of Dr. Glathe's testimony at the habeas corpus hearing that references defendant's confession. (*Ledesma I, supra,* 43 Cal.3d at pp. 194, fn. 5, 205.) During cross-examination, the prosecutor asked Dr. Evans—without objection—whether she was aware that defendant had confessed to Dr. Glathe. She testified that she was, but that defendant told her he was innocent. She commented further that Dr. Glathe had not performed any psychological tests and that the information he had was inadequate.

Another defense expert, Dr. Clark, also had read this court's decision in *Ledesma I.* When the prosecutor attempted to cross-examine him concerning his awareness of defendant's confession to Dr. Glathe, defense counsel objected, arguing that defendant's statements to Dr. Glathe were privileged. Defense counsel objected to any reference to Dr. Glathe's report, on the grounds that defendant's statements to him were protected by the attorney-client and psychotherapist-patient privileges, and that the prosecution should not be able to benefit from any evidence produced at the habeas corpus hearing because it was produced as a consequence of the ineffective representation provided by Attorney Parrish at the first trial. The trial court ruled that the prosecutor could question the experts concerning their awareness of defendant's statements to Dr. Glathe, and could ask them hypothetical questions regarding the confession, but that the statements could not be considered for their truth unless Dr. Glathe testified.[12]

Subsequently, defense counsel asked defense expert Dr. Rosenthal whether, if defendant had made a confession to a doctor, such a statement might be an example of his bragging or attempting to bolster himself. Dr. Rosenthal testified that it might be, and that making a shocking claim could be a way for defendant to accord himself a sense of power in a relationship with a person in authority. Defense counsel questioned Dr. Rosenthal concerning the statement in Dr. Glathe's report that defendant had exhibited an inappropriately "macho" affect. Dr. Rosenthal had read Dr. Glathe's report, and had testified about it at the habeas corpus hearing in 1985. In Dr. Rosenthal's

---

[12] Dr. Clark testified subsequently that he did not rely on Dr. Glathe's report in forming his opinions, and the prosecutor was not permitted to question him further on that subject.

opinion, Dr. Glathe's statement in the report that defendant probably was sane at the time of the crime was an indication that more work needed to be done before a conclusion could be reached on that issue.

The prosecutor called Dr. Glathe to testify in rebuttal. The trial court heard further argument and ruled that his testimony was admissible. Dr. Glathe, consulting his notes from his one-hour interview with defendant in October of 1979, testified that defendant told him that at the time of the offense, he had been laid off from work and had broken up with his girlfriend. According to Dr. Glathe, defendant told him that he "got the notion" to commit an armed robbery. He robbed a gas station attendant of $60 and used the money to purchase the drug PCP. He warned the victim he would kill him if he reported the crime. Thereafter he received an anonymous phone call informing him that the police were looking for him. Dr. Glathe recounted defendant's assertions that he had not covered the license plate on his motorcycle and that one week after the robbery, he went back to the gas station and kidnapped the victim, took him to Watsonville, shot him in the head, back, and chest, and stabbed him. Dr. Glathe also testified that defendant stated, "If I get the death penalty, I get it, I will hang myself first rather than give them the pleasure."

At the time defendant made his statements to Dr. Glathe, they were protected by the psychotherapist-patient privilege. (Evid. Code, § 1017; *People v. Clark, supra,* 50 Cal.3d 583, 621.) But under the patient-litigant exception, the psychotherapist-patent privilege was lost when defendant put his mental and emotional state in issue at trial. (Evid. Code, § 1016.)

 Because Dr. Glathe conducted a confidential interview of defendant for the purpose of assisting defense counsel in the preparation and presentation of a defense, defendant's statements to Dr. Glathe also were protected by the attorney-client privilege unless that privilege was waived or an exception applied. (*People v. Lines* (1975) 13 Cal.3d 500, 510 [119 Cal.Rptr. 225, 531 P.2d 793].) There is no client-litigant exception to the attorney-client privilege that is comparable to the patient-litigant exception to the psychotherapist-patient privilege. (*Id.* at p. 514; Evid. Code, § 1016.) The attorney-client privilege continues to protect a defendant's statements to a defense psychiatrist even if the defendant tenders a mental defense. (*Lines, supra,* 13 Cal.3d at p. 514.)

The Attorney General argues that Dr. Glathe's testimony nevertheless was admissible because defendant waived all privileges when, in the habeas corpus proceeding, defendant claimed that his trial counsel provided ineffective assistance in failing to investigate and present a diminished capacity defense. (See *In re Gray* (1981) 123 Cal.App.3d 614, 615–617, 176 Cal.Rptr.

721.) Evidence Code section 958 provides that there is no privilege "as to a communication relevant to an issue of breach, by the lawyer or by client, of a duty arising out of the attorney-client relationship." "Thus, for example, if the defendant in a criminal action claims that his lawyer did not provide him with an adequate defense, communications between the lawyer and client relevant to that issue are not privileged." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 176; see *In re Gray, supra*, 123 Cal.App.3d at p. 616.) The exception established in Evidence Code section 958 was intended precisely for the type of situation that occurred at defendant's habeas corpus hearing.

Defendant does not dispute that the attorney-client privilege was lost for purposes of the habeas corpus proceeding but contends that his statements to Dr. Glathe remained privileged for other purposes, including the retrial. Generally, a waiver of the privilege for purposes of one proceeding is applicable to all subsequent proceedings. (*People v. Clark* (1993) 5 Cal.4th 950, 1005 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [because the defendant waived attorney-client privilege by calling psychiatrist to testify during a suppression hearing, the defendant's statements to psychiatrist could be used to impeach other experts who testified at trial]; *People v. Haskett* (1990) 52 Cal.3d 210, 243 [276 Cal.Rptr. 80, 801 P.2d 323] [because the defendant waived privilege by calling psychiatrist to testify at first penalty trial, psychiatrist could testify regarding the defendant's admissions at penalty retrial].) Strictly speaking, however, Evidence Code section 958 establishes an exception to the privilege, not a waiver. A waiver occurs if the holder of the privilege discloses the communication or consents to disclosure by another, without coercion, or fails to claim the privilege in a proceeding in which he or she has the opportunity to do so. (Evid. Code, § 912, subd. (a).) Defendant asserted the privilege in the habeas corpus hearing, but the referee ruled that communications to Dr. Glathe were not privileged under Evidence Code section 958. The question presented here is whether the applicability of the Evidence Code section 958 exception in the habeas corpus proceeding rendered the privilege inapplicable in all further proceedings, including the retrial.

This court has not previously had the occasion to address that question. Defendant relies on *People v. Dennis* (1986) 177 Cal.App.3d 863, 874–876 [223 Cal.Rptr. 236] (*Dennis*), which concluded that a defendant must be granted use immunity for disclosures he makes in support of a motion for a new trial based upon ineffective assistance of counsel.[13] *Dennis* held that

---

[13] In *People v. Macias* (1997) 16 Cal.4th 739 [66 Cal.Rptr.2d 659, 941 P.2d 838], we cited *Dennis* for the proposition that statements made by a defendant during a motion for new trial on the ground of ineffective assistance of counsel are protected from substantive use but may be used for impeachment.

because the information a defendant would be required to disclose in support of a new trial motion might lighten the prosecution's burden in bringing about a conviction upon a new trial, the defendant should be granted use immunity for the material disclosed. *Dennis* relied upon the reasoning of a number of decisions by this court granting use immunity in other contexts in which it would be unfair to require the defendant to choose between maintaining a privilege and asserting other important rights. For example, in *People v. Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], we concluded that when a defendant is subject to probation revocation proceedings upon grounds that are also the basis for criminal charges, his testimony at the revocation proceedings is inadmissible at a subsequent trial on the criminal charges (except to rebut inconsistent testimony by the defendant in the criminal trial). We recognized that the public interest in "informed, intelligent and just revocation decisions" would be furthered if the probationer were not discouraged from speaking freely at such proceedings. (*Id.* at p. 873.) On the other hand, the prosecution's burden to prove guilt at a criminal trial without requiring the defendant to incriminate himself would be lightened if the prosecution, simply by moving to revoke probation before the criminal trial, could attempt to force the probationer into making incriminatory statements at the revocation proceeding. (*Id.* at p. 876.) We concluded that to force an individual to choose among the "unpalatable alternatives" of self-accusation, perjury, or silence at the probation hearing in order to protect his or her constitutional right not to incriminate oneself at the criminal proceedings "runs counter to our historic aversion to cruelty reflected in the privilege against self-incrimination." (*Id.* at p. 878.)

Similarly, in *Bryan v. Superior Court* (1972) 7 Cal.3d 575, 586–589 [102 Cal.Rptr. 831, 498 P.2d 1079], we held that a minor's statements made in connection with juvenile court proceedings cannot be used against him at a subsequent criminal trial after he has been found unfit for treatment as a juvenile. We reasoned, in part, that the minor "should not be put to the unfair choice of being considered uncooperative by the juvenile probation officer and juvenile court because of his refusal to discuss his case with the probation officer, or of having his statements to that officer used against him in subsequent criminal proceedings." (*Id.* at pp. 587–588; see also *In re Wayne H.* (1979) 24 Cal.3d 595, 602 [156 Cal.Rptr. 344, 596 P.2d 1] [admissions made to a probation officer at a required postdetention interview may not be used at the minor's juvenile court jurisdiction hearing]; *People v. Harrington* (1970) 2 Cal.3d 991, 999–1000 [88 Cal.Rptr. 161, 471 P.2d 961] [use immunity applied to the defendant's discussion of case details with a probation officer after conviction].)

Although few courts have addressed the issue directly, the weight of authority from other jurisdictions supports the reasoning of *Dennis, supra,* 177 Cal.App.3d 863. The Supreme Court of Pennsylvania has held that "the

policy inherent in the legislative recognition and judicial enforcement of the attorney-client privilege, as it implicates a defendant's exercise of the right to the effective assistance of counsel and to freedom from compelled self-incrimination, restricts the use as well as the scope of permitted disclosures. Just as an attorney may not respond to allegations of ineffectiveness by disclosing client confidences unrelated to such allegations, so the client confidences properly disclosed by an attorney at an ineffectiveness hearing may not be imported into the client's subsequent trial on criminal charges." (*Com. v. Chmiel* (1999) 558 Pa. 478 [738 A.2d 406, 424].)

A Missouri appellate court reached a similar conclusion, holding that a defendant's testimony at a postconviction hearing challenging his conviction on the ground of ineffective assistance of counsel could not be admitted against him when he was retried. (*State v. Samuels* (Mo.Ct.App. 1998) 965 S.W.2d 913.) *Samuels* relied upon the reasoning of *Simmons v. United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967]. In *Simmons*, the United States Supreme Court held that a defendant's testimony at a pretrial hearing on his motion to suppress evidence of an illegal search could not be used against him at trial. The high court reasoned that a defendant should not be forced to surrender his Fifth Amendment right not to incriminate himself in order to protect his Fourth Amendment right to be free from unreasonable searches and seizures. The Missouri court similarly reasoned that a defendant should not be forced to choose between enforcing his Sixth Amendment right to the effective assistance of counsel and his Fifth Amendment right not to incriminate himself. (*Samuels, supra,* 965 S.W.2d at p. 919; see also *Waldrip v. Head* (2000) 272 Ga. 572 [532 S.E.2d 380] [the defendant waived attorney-client privilege as to documents relevant to claims of ineffective assistance, but disclosure of such documents should be limited to the purpose of rebutting claim of ineffectiveness].)

The United States Court of Appeals for the Ninth Circuit similarly has held, in an en banc decision, that in federal habeas corpus proceedings the petitioner's waiver of the attorney-client privilege arising from a claim of ineffective assistance of counsel extends only to litigation of the petition. (*Bittaker v. Woodford* (9th Cir. 2003) 331 F.3d 715.) *Bittaker* upheld a district court's order precluding the disclosure of privileged attorney-client materials for any purpose other than litigating the federal habeas corpus petition. The court could "conceive of no federal interest in enlarging the scope of the waiver beyond what is needed to litigate the claim of ineffective assistance of counsel in federal court." (*Id.* at p. 722.) On the other hand, "[a] broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the attorney-client and work product privileges are designed to promote." (*Ibid.*) Furthermore, "[t]he fortuity that defendant's initial trial was constitutionally defective gives the prosecution no just claim to the lawyer's case file or testimony. To the

contrary, allowing the prosecution at retrial to use information gathered by the first defense lawyer—including defendant's statements to his lawyer—would give the prosecution a wholly gratuitous advantage." (*Id.* at p. 724.)

We find the reasoning of these cases persuasive. We have recognized that in some circumstances the attorney-client privilege may apply even when the communications at issue have been disclosed in another context and are no longer confidential. (*People v. Clark, supra,* 50 Cal.3d 583, 620–621 [although defense psychologist properly disclosed communications to third parties to avert potential danger to them, thereby eliminating the psychotherapist-patient privilege, attorney-client privilege nevertheless applied].) In *Clark,* we noted that the purpose of the psychotherapist-patient privilege is to promote the therapeutic relationship, a purpose that "can no longer be achieved once the therapist has revealed the confidential communications to third parties." (*Id.* at p. 621.) In contrast, however, we found no provision in the Evidence Code that reflected "an intent that the attorney-client privilege terminate if a communication to an attorney is made public without a waiver of confidentiality by the client." (*Ibid.*) The attorney-client privilege "exists to permit a client to freely and frankly reveal confidential information, including past criminal conduct, to the attorney or others whose purpose is to assist the attorney, and to thereby enable the attorney to adequately represent the client. [Citation.] In a criminal case the privilege also serves to preserve the defendant's privilege against self-incrimination . . . . To make adequate representation possible, therefore, these privileges assure criminal defendants that confidential statements to their attorney will not be admissible in any proceeding." (*Id.* at p. 620, fn. omitted.)

The purpose of the exception to the attorney-client privilege established by Evidence Code section 958 is to avoid the injustice of permitting "a client either to accuse his attorney of a breach of duty and to invoke the privilege to prevent the attorney from bringing forth evidence in defense of the charge or to refuse to pay his attorney's fee and invoke the privilege to defeat the attorney's claims." (7 Cal. Law Revision. Com. Rep., *supra,* p. 176.) That purpose was fully met when Dr. Glathe was permitted to testify for the prosecution at the habeas corpus hearing. To interpret Evidence Code section 958 as abolishing the privilege for all purposes in this context would raise serious questions as to whether section 958 conflicts with the defendant's Sixth Amendment right to counsel, a right that the privilege is intended to promote.

Furthermore, in a case such as this, in which the defendant successfully established that his previous attorney provided constitutionally ineffective assistance, the disclosure of confidential communications at the habeas corpus hearing can be attributed to the attorney's ineffective assistance. The

admission of those communications at a retrial may be viewed as a further consequence of the violation of the defendant's right to effective assistance of counsel. (Cf. *People v. Karlin, supra,* 231 Cal.App.2d 227 [the defendant's admissions made at preliminary hearing, when his attorney had a conflict of interest, could not be used at his subsequent trial].) In light of these serious constitutional concerns, we conclude the attorney-client privilege continues to apply for purposes of retrial after otherwise privileged matters have been disclosed in connection with habeas corpus proceedings, under Evidence Code section 958.

Nevertheless, we agree with the Attorney General's alternative argument that the privilege was waived at trial when the defense presented the testimony of expert witnesses who had reviewed and considered Dr. Glathe's report and prior testimony. Both Dr. Evans and Dr. Clark testified that they had reviewed this court's decision in *Ledesma I*, which included the complete text of Dr. Glathe's report and referred to defendant's confession to Dr. Glathe. (*Ledesma I, supra,* 43 Cal.3d at pp. 195, fn. 5, 205.) Dr. Evans had reviewed a transcript of the hearing in the habeas corpus proceeding, which included Dr. Glathe's testimony concerning defendant's confession to him, and the prosecution cross-examined her about defendant's statements to Dr. Glathe without objection.

■ An expert witness may be cross-examined as to "the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) The scope of cross-examination permitted under section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion. (See *People v. Osband* (1996) 13 Cal.4th 622, 712 [55 Cal.Rptr.2d 26, 919 P.2d 640] [under Evid. Code, § 721, subd. (a), expert who was familiar with the defendant's juvenile record could be cross-examined about it "to determine whether he took it into account" in forming his opinion].) "Once the defendant calls an expert to the stand, the expert loses his status as a consulting agent of the attorney, and neither the attorney-client privilege nor the work-product doctrine applies to matters relied on or considered in the formation of his opinion." (*People v. Milner* (1988) 45 Cal.3d 227, 241 [246 Cal.Rptr. 713, 753 P.2d 669]; cf. *People v. Coddington* (2000) 23 Cal.4th 529, 604–606 [97 Cal.Rptr.2d 528, 2 P.3d 1081] [prosecutor's cross-examination of testifying defense experts about prior examinations of the defendant by nontestifying defense experts violated work-product privilege, when testifying experts were not aware of the earlier examinations].)

In *People v. Combs* (2004) 34 Cal.4th 821 [22 Cal.Rptr.3d 61, 101 P.3d 1007] (*Combs*) we recognized that the prosecution is entitled to cross-examine an expert concerning an otherwise privileged report considered by

the expert in formulating his or her opinion. In *Combs*, a psychiatrist, Dr. Oshrin, examined the defendant and provided a report to defense counsel. (*Id.* at p. 862.) Although Dr. Oshrin did not testify, the prosecutor was permitted to cross-examine two other defense experts concerning Dr. Oshrin's report. Both doctors had read and considered Dr. Oshrin's report and relied upon portions of it in forming their opinions. (*Id.* at p. 863.) We rejected the defendant's argument that the trial court erred in requiring the defense to provide a copy of Dr. Oshrin's report to the prosecution, noting that, contrary to the defendant's contention, the defendant voluntarily had furnished Dr. Oshrin's report to the prosecutor during the examination of another defense expert, Dr. Crinella. This court "presume[d] that defense counsel provided Dr. Oshrin's report because he knew that the prosecutor was entitled to cross-examine Dr. Crinella about its contents." (*Id.* at p. 862.)

The defendant in *Combs* also argued that allowing the prosecutor to call Dr. Oshrin as a rebuttal witness violated the attorney-client privilege. Although we concluded that the defendant had forfeited the issue by failing to assert the attorney-client privilege at trial, we addressed the merits of the claim, stating that "[d]efendant waived any protections that the attorney-client privilege, the attorney work product doctrine, and the privilege against self-incrimination afforded him regarding all matters that [the testifying defense experts] considered or on which they relied, including Dr. Oshrin's report." (*Combs, supra,* 34 Cal.4th at p. 864.) We rejected the defendant's argument that the defense experts could be cross-examined only as to those portions of Dr. Oshrin's report that they had adopted and relied upon. (*Id.* at pp. 863–864.) Furthermore, because the defendant waived all privileges regarding Dr. Oshrin's report, "the prosecutor was free to call Dr. Oshrin as a rebuttal witness and to question him about that report." (*Id.* at p. 864.) Likewise, in the present case, defendant waived the protections of the attorney-client privilege as to his statements to Dr. Glathe by presenting the testimony of experts who had reviewed and considered Dr. Glathe's report and his testimony at the habeas corpus hearing.[14]

### 2. *Consideration of confession to Dr. Glathe for the truth of the matter*

Defendant contends the trial court erred by instructing the jury that Dr. Glathe's testimony concerning defendant's confession to him could be

---

[14] Defendant alternatively argues that Dr. Glathe's testimony should have been excluded because it was the fruit of former counsel's ineffective assistance. We find no basis for concluding that defendant would not have made a confession to Dr. Glathe had he received competent assistance from his first trial attorney. To the extent defendant argues that Dr. Glathe's testimony was the fruit of his attorney's ineffective assistance because it was disclosed during the habeas corpus proceedings, the substance of this argument has been addressed above.

considered for the truth of the matter and as evidence of guilt. The trial court did not formally instruct the jury that Dr. Glathe's testimony could be considered as evidence of guilt, but did make statements in the jury's presence indicating that the testimony had been admitted for that purpose. During the cross-examination of Dr. Glathe, defense counsel asked the court whether it was correct that what the witness had been told by defendant had not been received for the truth of the matter stated. The court, in the presence of the jury, replied, "No, it has been offered for the truth of the matter stated." Later during the cross-examination, the court sustained an objection to a question asked by defense counsel that may have appeared to relate to the witness's opinion concerning whether defendant had been telling him the truth. The court explained its ruling as follows: "The doctor has testified to a statement made by the defendant. . . . [B]ut it's for the jury to determine whether or not that statement is to be believed. . . . [I]t's the truth or falsity of the statement that is in question and this witness cannot help us on that."

Defendant asserts that the court's comments were erroneous, because under *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33] (*Spencer*), defendant's statements to Dr. Glathe could be considered only as the basis for his expert opinion. We have stated, "It is well settled that an expert's testimony as to a defendant's incriminating statements may not be regarded as proof of the facts described in such statements." (*People v. Williams* (1988) 45 Cal.3d 1268, 1327 [248 Cal.Rptr. 834, 756 P.2d 221], citing *People v. Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256] and *Spencer, supra,* 63 Cal.2d 400.) This rule derives from our decision in *Spencer. Spencer* held that a defendant may be examined by a court-appointed psychiatrist without the presence of his attorney, but established two safeguards in order to protect the defendant's right to counsel: First, the psychiatrist may not testify unless the defendant puts his or her mental state in issue. Second, if the psychiatrist testifies, the jury must be instructed that any incriminating statements made to him or her by the defendant may be considered only as the basis for an opinion, and not for the truth of the matters stated. (*Spencer, supra,* 63 Cal.2d at pp. 412–413.)

Even if *Spencer* is applicable (and, as discussed below, we conclude it is not), defendant has forfeited any claim that the trial court's comments were erroneous, because he did not request an instruction that Dr. Glathe's testimony could be considered only for the limited purpose of evaluating the basis of the experts' opinions. The trial court is not required to give the limiting instruction prescribed by *Spencer* in the absence of a request. (*People v. Cantrell, supra,* 8 Cal.3d 672, 683.) Defendant argues that the issue has not been forfeited because any request for a limiting instruction would have been futile. We disagree. The trial court did indicate in response to defense counsel's questions that the testimony was admissible for its truth, but defense counsel never argued that it could be admitted only for a limited

purpose under *Spencer*. Rather, counsel argued that Dr. Glathe could not testify at all, because of the attorney-client privilege. Defense counsel also objected to Dr. Glathe's testifying on the ground that his testimony should be excluded under Evidence Code section 352 as more prejudicial than probative, and as cumulative. Defense counsel did not argue that the testimony, if admitted, could be admitted for a limited purpose.

 Even if the issue had not been forfeited, we would find no error, because *Spencer* applies when the defendant's admissions are made to an expert who has been appointed to report to the court, but not when the defendant's admissions are made to an expert appointed to assist defense counsel. *Spencer* required a limiting instruction when an expert who was appointed by the court to examine the defendant testified regarding the defendant's mental state. *Spencer* acknowledged that under *Massiah v. United States* (1964) 377 U.S. 201, 205 [12 L.Ed.2d 246, 84 S.Ct. 1199], the defendant has a right to have counsel present at such an examination, but that "such presence may largely negate the value of the examination." (*Spencer, supra*, 63 Cal.2d at p. 411.) The court concluded that the presence of counsel at such a psychiatric examination "is not constitutionally required so long as certain safeguards are afforded to defendant." (*Id.* at p. 412.) These safeguards include the following: (1) before submitting to an examination by a court-appointed psychiatrist, the defendant must be represented by counsel or must waive that right; (2) counsel must be informed of the appointment of the psychiatrist; (3) if the defendant does not place his or her mental state in issue, the psychiatrist should not be permitted to testify; and (4) if the psychiatrist does testify, "the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion." (*Ibid.*) These "safeguards are sufficient to justify the exclusion of counsel from the psychiatric examination and at the same time avoid a deprivation of defendant's constitutional rights." (*Id.* at p. 413.) "Under this formulation, a defendant's constitutional rights are amply protected, while the court, the prosecution, and the defendant will obtain the benefit of the testimony of an impartial psychiatrist as to defendant's mental condition." (*Ibid.*)

*Spencer*'s rationale is inapplicable when the psychiatrist is appointed to assist the defense and the communications between defendant and the psychiatrist are, hence, protected by the attorney-client privilege. When, as in the present case, the psychiatrist has been appointed to assist the defense and operates under the attorney-client privilege, the state has not interfered in any way with the defendant's right to counsel. The defendant and his or her attorney may decide whether the attorney should be present when the psychiatrist interviews the defendant and may decide whether or not to use

the results of the examination at trial. Even if the defendant places his or her mental state in issue, the defendant does not thereby waive the attorney-client privilege. (*People v. Lines, supra,* 13 Cal.3d at p. 514.) The psychiatrist may testify only if the defendant calls the psychiatrist as a witness or waives the privilege in some other manner.

Defendant cites this court's decision in *People v. Morse* (1969) 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607] (*Morse*) for the proposition that the safeguards set out in *Spencer* apply even when the psychiatrist has been appointed to assist the defense. *Morse* sometimes has been cited for that proposition, and on occasion we have assumed that *Spencer* does apply to defense psychiatric experts. (See, e.g., *People v. Clark, supra,* 5 Cal.4th 950, 1008 [jury was admonished not to consider statements made by defendant to defense psychiatrist for the truth of their contents; defendant's claim that evidence was misused for its substance was rejected]; *People v. Cantrell, supra,* 8 Cal.3d 672, 683–684 & fn. 2 [finding no error in the court's failure to give a limiting instruction under *Spencer,* because the defendant had not requested one when three psychiatrists, called by the defense (one of whom had been selected by the defendant's counsel to advise the defense), testified concerning the defendant's incriminating statements]; see also *People v. Balderas* (1985) 41 Cal.3d 144, 167, fn. 7 [222 Cal.Rptr. 184, 711 P.2d 480] [trial court admonished jury to consider defense expert's testimony concerning the defendant's admissions only as bearing on his opinion and not as evidence of guilt].)

Nevertheless, *Morse, supra,* 70 Cal.2d 711, does not hold that the *Spencer* safeguards apply whenever the psychiatrist has been appointed to assist the defense. In *Morse,* a psychiatrist testified for the defense and gave an opinion concerning the defendant's mental state at the time of the offense. During cross-examination, the psychiatrist admitted he had reviewed a transcript of an interview between the defendant and police officers. The trial court previously had ruled this interview inadmissible because it was conducted in violation of the defendant's right to counsel. Nevertheless, the trial court permitted the prosecutor to question the psychiatrist about several of the statements made by the defendant during the police interview but admonished the jury that it could consider those statements only for the purposes of testing the psychiatrist's credibility and opinion. (*Id.* at p. 725.)

On appeal the defendant argued that, because the interview had been obtained in violation of his constitutional rights, it "could not form the basis of cross-examination without infringing upon those same rights." (*Morse, supra,* 70 Cal.2d at p. 725.) Analogizing to *Spencer,* this court rejected the defendant's argument, because the jury had been admonished to consider the statements only for the purpose of impeaching the expert and not for their

substance. (*Morse, supra,* 70 Cal.2d. at p. 726.) This court indicated that the circumstances that the psychiatrist involved was appointed specifically to aid the defense, and that there were other differences between the two cases—"do not render our *Spencer* rationale inapplicable." (*Ibid.*) In both situations the defendant's interview with the court-appointed psychiatrist without the presence of counsel in *Spencer*, and the defense experts' consideration of the defendant's statements to the police made without counsel in *Morse*— "defense counsel has consented to the use of incriminating statements for the purpose of psychiatric evaluation. . . . In either situation the defense can have no cause for complaint when the incriminating statements are brought to light as one of the bases of the expressed opinion, provided of course that the proper limiting instruction has been given." (*Ibid.*)

The "*Spencer* rationale" that applied in *Morse* was *Spencer*'s conclusion that a defendant's right to counsel is not violated if a limiting instruction is given. A violation of the defendant's right to counsel in *Morse* occurred because he was interviewed *by the police* without his counsel being present, not because he was interviewed by the *defense psychiatrist* without his counsel being present. *Morse* does not support the proposition that the defendant's right to counsel, or any other constitutional right, is violated when a defense psychiatrist testifies concerning statements made to him or her by the defendant. Neither *Spencer* nor *Morse* supports the conclusion that a limiting instruction must be given even when the constitutional right to the assistance of counsel is not at issue. Accordingly, the trial court was not required by *Spencer* to instruct the jury that Dr. Glathe's testimony concerning defendant's statements could not be considered as proof of the truth of the matter stated.[15]

Furthermore, we cannot conclude that the absence of a limiting instruction denied defendant a fair trial. Defendant's confessions to other witnesses already were properly before the jury. It was permissible for the jury to consider the fact that defendant made a confession to Dr. Glathe for the nonsubstantive purpose of rebutting the defense experts' theory that his similar confessions to other witnesses were false. Under these circumstances, "a limiting instruction would have had little or no effect." (*People v. Cantrell, supra,* 8 Cal.3d at p. 683 [absence of a limiting instruction required by

---

[15] Of course, if the statements concerning which a psychiatrist testifies do not fall within an exception to the hearsay rule, they would be admissible only as the basis of the psychiatrist's opinion, and a limiting instruction normally would be given if requested. (See CALJIC No. 2.10 [which was given at defendant's trial]; see also Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 360.) Here, however, defendant's statements to Dr. Glathe constituted admissions, and the hearsay rule did not prevent the jury from considering them as proof of the matters asserted. (Evid. Code, § 1220.)

*Spencer* did not deny the defendant a fair trial when incriminating statements he made to psychiatrists were essentially the same as those he made to other witnesses].)

### 3. *Evidence Code section 352*

Defendant further asserts that the trial court erred in admitting Dr. Glathe's testimony under Evidence Code section 352, asserting that it was more prejudicial than probative. We review the trial court's ruling for abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134 [14 Cal.Rptr.3d 212, 91 P.3d 164].) The evidence was relevant to rebut defendant's assertions that he had not confessed to other witnesses or that in doing so he was merely bragging. Defendant contends the jury could not properly evaluate whether Dr. Glathe's testimony related a true or false confession without considering the context in which defendant's statement was made, including the ineffective assistance of prior counsel, and that such consideration could not be accomplished without undue prejudice. The question of whether defendant's confessions were false was fully litigated, however. Defense counsel cross-examined Dr. Glathe concerning his failure to conduct further psychological tests or explore the truth or falsity of the confession, and Dr. Glathe admitted that had he been aware defendant had a pattern of telling stories and had brain damage those circumstances might have affected his expert opinion. Defense expert Dr. Rosenthal testified that defendant could have made a false confession to Dr. Glathe as a means of establishing power in a relationship with an authority figure. We find no abuse of discretion.

### 4. *Evidence Code section 804, subdivision (b)*

Defendant argues alternatively that Dr. Glathe's testimony should have been excluded under Evidence Code section 804, because Dr. Glathe was defendant's agent within the meaning of that statute. Subdivision (a) of section 804 provides that if an expert witness testifies that "his opinion is based in whole or in part upon the opinion or statement of another person, such other person may be called and examined by any adverse party as if under cross-examination concerning the opinion or statement." Section 804 does not apply if the person upon whose opinion the expert relied is "identified with" a party, a term that includes someone who is an agent of the party. (Evid. Code, §§ 804, subd. (b), 776, subd. (a).)

Defendant's argument is misplaced. Evidence Code section 804 governs the manner of examination; it permits a party to cross-examine the expert even though the expert is the party's own witness. (See 7 Cal. Law Revision Com. Rep., *supra*, p. 152.) The circumstance that section 804 does not apply if the expert is an agent of a party does not preclude calling the

expert as a witness; that circumstance simply signifies that the examination is governed by other applicable statutes. (See, e.g., Evid. Code, § 776 [authorizing a party or person identified with a party to be called as a witness by an adverse party, but requiring that counsel for the party who is the witness or is identified with the witness examine the witness as if on redirect examination]; 7 Cal. Law Revision Com. Rep., *supra*, p. 1221 [noting that language of Evid. Code, § 1203, subd. (b), which is identical to the relevant language of Evid. Code, § 804, subd. (b), would prohibit counsel for a party from examining his or her own client as if under cross-examination].)

### E. *Interception of Telephone Call*

Defendant contends evidence of a telephone call from him that was intercepted by police officers when they were in his apartment was obtained in violation of the Fourth Amendment of the federal Constitution and article I, section 13 of the California Constitution and should have been excluded at trial. Evidence presented in the trial court at a hearing on defendant's motion to suppress evidence of the telephone call established the following:

When the police interviewed the victim (Mr. Flores) about 15 minutes after the robbery, he reported a license plate number for the motorcycle that had been used by the robbers. Defendant was the registered owner of that vehicle. His name and the address used for the registration were broadcast over the police radio. Officer Webster heard the broadcast and promptly went to the address, where he was told that defendant no longer resided at that location but now resided in a duplex in the vicinity of Third and Hedding in San Jose and that he drove a white Cadillac. As Officer Webster drove around the area of Third and Hedding, he observed a white Cadillac parked in a driveway in front of a house. Webster ran a check on the license plate and found that the Cadillac was registered to defendant. The officer watched the house for approximately 20 minutes until additional officers arrived. He and two other officers went to the front door, and he knocked at approximately 6:15 or 6:30 p.m.

The door was answered by Lawrence Santiago, who stated when asked that he was not defendant and that defendant was not in the house. Officer Webster asked Santiago whether he would mind if the officers entered and looked around. Santiago said he was just visiting but that he did not mind, and stepped back to let the officers in. Millie Dominguez also was present. The officers entered and searched the house but did not find defendant. One of the two occupants of the house mentioned that defendant had called earlier and was expected to call back. When the telephone rang, the officers instructed the occupants not to answer it. Officer Guerra picked up the phone, pretending to be Millie Dominguez. The caller identified himself as defendant

and said that he was "hot" and that the police were looking for him. He instructed her to lock the doors of the apartment and the Cadillac and to take a walk.

The trial court denied defendant's motion to suppress, concluding that the officers' entry into the house was consensual, and that the interception of the call was the result of a "fresh pursuit situation." Officer Guerra was permitted to testify at trial concerning the contents of the telephone call.

In its opinion reversing defendant's first conviction, this court concluded that counsel at defendant's first trial provided ineffective assistance in failing to move to suppress evidence of the intercepted telephone call. We observed that because the officers' entry into the apartment was without a warrant, it was presumptively unlawful. (*Ledesma I, supra,* 43 Cal.3d at p. 227.) However, we also noted that if counsel had challenged the admissibility of the call, "the prosecution may well have been successful in rebutting the presumption of unlawfulness," and stated that the prosecution was not foreclosed from attempting on retrial to "rebut the presumption of unreasonableness." (*Id.* at p. 227, fn. 11; see also *id.* at p. 236 (conc. opn. of Mosk, J.) [concluding that it appeared the police entry was not based on voluntary consent and that even if it was, the consent did not extend to interception of the telephone call, but noting that if defense counsel had challenged the admissibility of the intercepted call, the prosecutor "might have presented evidence and argument to show that the entry was lawful or that the intercepted telephone call was admissible"].) We conclude, based on the record of the retrial, that the prosecution succeeded in rebutting the presumption that the entry into defendant's house and subsequent interception of the telephone call were unlawful.

 To establish consent, the prosecution was required to prove that the officers reasonably and in good faith believed that Santiago had the authority to consent to their entry into the apartment. (See *Illinois v. Rodriguez* (1999) 497 U.S. 177 [111 L.Ed.2d 148, 110 S.Ct. 2793]; *People v. Escudero* (1979) 23 Cal.3d 800 [153 Cal.Rptr. 825, 592 P.2d 312].) Although Santiago was just visiting, he and Dominguez were present in the apartment in the early evening when defendant was not at home. Cases from a number of jurisdictions have recognized that a guest who has the run of the house in the occupant's absence has the apparent authority to give consent to enter an area where a visitor normally would be received. (See, e.g., *United States v. Turbyfill* (8th Cir. 1975) 525 F.2d 57; *Nix v. State* (Alaska 1981) 621 P.2d 1347; *State v. Thompson* (Minn. 1998) 578 N.W.2d 734; see also 4 La Fave, Search and Seizure (4th ed. 2004) § 8.5(e).) Furthermore, the police may assume, without further inquiry, that a person who answers the door in response to their knock has the authority to let them enter. (See *Mann v.*

*Superior Court* (1970) 3 Cal.3d 1 [88 Cal.Rptr. 380, 472 P.2d 468] [entry was consensual where the police knocked on the door of the defendant's house, in which a party was taking place, and voices inside called out "come in"].) There is no indication that the consent given here was involuntary. ▮ The officers asked Santiago for permission to enter and inspect; such a request, by its nature, carries the implication that permission may be withheld. (See *People v. James* (1977) 19 Cal.3d 99, 116 [137 Cal.Rptr. 447, 561 P.2d 1135].) Therefore, the officers reasonably believed they had consent to enter and were lawfully in the apartment when they answered the phone.[16]

The officers' interception of defendant's phone call when they were lawfully present in his apartment was not improper, because it was based on probable cause, and exigent circumstances justified the officers' failure to obtain a warrant. The information supplied by Santiago and Dominguez gave them reason to believe that the incoming call would be from defendant and that, by answering it, they would obtain information leading to his imminent capture. (See *People v. Sandoval* (1966) 65 Cal.2d 303, 308 [54 Cal.Rptr. 123, 419 P.2d 187] [officers who were engaged in a lawful search justifiably could answer the telephone and conceal their identity because they had information that the telephone was being used in drug transactions]; *People v. Drieslein* (1985) 170 Cal.App.3d 591 [216 Cal.Rptr. 244] [same].) The delay required to obtain a warrant obviously would have resulted in the loss of this opportunity.

*People v. Harwood* (1978) 74 Cal.App.3d 460 [141 Cal.Rptr. 519] is distinguishable. In that case, the court held that consent to enter and search the premises did not include consent to intercept telephone calls. In *Harwood*, the police suspected that narcotics were kept in the apartment but had no specific information indicating that the telephone was being used for narcotics transactions. (*Id.* at p. 468.) In the present case, the police had specific information that defendant was likely to call and thus reason to believe that answering the telephone could lead to information regarding his location.

## F. *Testimony of Jona Cardona*

▮ Defendant argues that several of the trial court's various rulings regarding defense counsel's attempts to impeach prosecution witness Jona Cardona were erroneous and denied him his right to confront and cross-examine the witness under the confrontation clause of the federal Constitution.

---

[16] Contrary to defendant's contention at oral argument, the recent decision of the high court in *Georgia v. Randolph* (2006) 547 U.S. 103 [164 L.Ed.2d 208, 126 S.Ct. 1515] does not affect our conclusion. That case held that the police cannot reasonably rely on one co-occupant's consent to search a residence when the other co-occupant expressly refuses consent. It does not change the legal standards applicable to the present case, in which defendant was not present when the police received consent to enter his residence and did not refuse such consent.

Trial judges retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679–680 [89 L.Ed.2d 674, 106 S.Ct. 1431]; see *People v. Jennings* (1991) 53 Cal.3d 334, 372 [279 Cal.Rptr. 780, 807 P.2d 1009].) A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].) As explained below, we find no abuse of discretion in the trial court's rulings.

First, defendant challenges the trial court's ruling sustaining objections to defense counsel's questions regarding burglary charges that were pending against Cardona in 1980, at the time she made an anonymous telephone call to the police to report discussions she had heard about the murder. The trial court ruled that the information sought to be elicited by defense counsel was not relevant to establishing that she had a motive to lie in order to curry favor with the police, because the call was anonymous; she could not have received favorable treatment had the police not known who she was. This conclusion is reasonable, and the trial court did not abuse its discretion. Likewise, the trial court did not abuse its discretion in sustaining objections to defense counsel's questions concerning Ms. Cardona's involvement in a variety of criminal activities, including prostitution and the use and distribution of drugs. To the extent evidence of such activities was relevant to her credibility, it was cumulative. Cardona testified that she had felony convictions for burglary and petty theft with a prior, that she had been arrested and went to jail many times, that she had served time in prison, and that she had used drugs, including PCP and heroin.

Second, defendant challenges the trial court's ruling sustaining objections to a line of questions asked by defense counsel regarding Cardona's hospitalization for psychiatric treatment in 1972. Defense counsel attempted to inquire whether, when she was in the mental hospital, she had expressed violent feelings toward her child or other violent fantasies, whether she was told that she was a person who manipulated other individuals and had a psychopathic streak, and whether she had told anyone she had delusions, hallucinations, confusion, and poor memory. The trial court sustained objections to these questions on the grounds of relevance and, in some instances, privilege, and ordered counsel to discontinue this line of questioning. The trial court did not abuse its discretion. The hospitalization occurred in 1972, more than 16 years before her testimony at trial, and thus had little bearing on Cardona's credibility at the time she testified. (See *People v. Rodriguez* (1986)

42 Cal.3d 730, 749 [230 Cal.Rptr. 667, 726 P.2d 113] [trial court did not err in excluding testimony regarding the witness's psychiatric treatment five years before trial, when she was only 15 years of age, because the evidence "did not have sufficient bearing upon the credibility of her testimony at the trial, when she was 20"].)

Third, defendant contends the trial court erred in refusing to permit him to establish, through the testimony of Mary Perez, that Cardona could have been motivated by jealousy and revenge to falsely implicate Jesse and George Perez. The trial court did not abuse its discretion in excluding this evidence, the relevance of which was minimal. The testimony did not provide any motive for Cardona to falsely implicate defendant.

Defendant also contends the trial court should have instructed the jury, on its own motion, on the rule that an accomplice's testimony should be viewed with distrust and must be corroborated. (See CALJIC Nos. 3.10–3.18.) Defendant's theory is that the jury could have believed that Cardona did not actually hear defendant confess to the crimes, and that her testimony was based instead on information she received from George Perez, one of defendant's accomplices in the murder. Instructions on accomplice testimony must be given if there is evidence to support the conclusion that a prosecution witness was an accomplice. (*People v. Guiuan* (1998) 18 Cal.4th 558, 564–565 [76 Cal.Rptr.2d 239, 957 P.2d 928].) No accomplice testified at defendant's trial, and defendant's theory that Cardona indirectly testified based upon information obtained from an accomplice amounts to nothing more than conjecture.

### G. *Hearsay Statements of Gabriel Flores*

#### 1. *Identification of defendant in photographic lineup*

Defendant contends the trial court improperly admitted hearsay testimony that the victim Flores picked defendant's picture out of a photographic lineup.[17] After a pretrial hearing on the issue, the trial court ruled that evidence of the identification was relevant for a nonhearsay purpose—to establish that defendant's motive for killing Flores was to eliminate him as a witness. The identification that was made provided evidence of a motive, regardless of whether it was accurate. The trial court also concluded that the probative value of the evidence was not outweighed by its prejudicial effect. The court instructed the jury that this evidence was offered to show a motive

---

[17] In *Ledesma I*, we concluded that trial counsel's failure to move pretrial to bar reference to the identification, or at least to object to such reference, amounted to incompetence. (*Ledesma I, supra*, 43 Cal.3d at p. 224.)

for the murder and was not to be considered for its truth, that is, to prove that defendant committed the robbery.

■ It was alleged as a special circumstance that the victim was "intentionally killed for the purpose of preventing his testimony in any criminal proceeding." (Former § 190.2, subd. (c)(2).) It is the "accused's subjective intent that is crucial" to establish the witness-killing special circumstance. (*People v. Weidert* (1985) 39 Cal.3d 836, 854 [218 Cal.Rptr. 57, 705 P.2d 380].) In *People v. Heishman* (1988) 45 Cal.3d 147, 171 [246 Cal.Rptr. 673, 753 P.2d 629], we held that evidence establishing that the deceased victim had identified the defendant as the person who had raped her was admissible to prove a witness-killing special circumstance. In *Heishman*, the defendant actually had been charged with the rape at the time of the capital crime. Although the defendant's knowledge of the pending charges provided some evidence that he killed the victim to prevent her from testifying, we concluded that evidence demonstrating that she actually had identified him nevertheless was relevant to prove the special circumstance allegation. The defendant "would not likely believe it was necessary to kill his accuser unless he knew or believed she had identified him to the police and was prepared to identify him at trial." (*Id.* at p. 172.)[18]

Defendant contends that the victim Flores's identification of defendant's photograph nevertheless should have been excluded as more prejudicial than probative under Evidence Code section 352 because of the risk that the jury would use it for an improper purpose, that is, to prove the charge that defendant robbed Flores. Defendant also contends the probative value of the actual identification was minimal, because there was other evidence from which the jury could conclude that defendant believed he had been identified—namely, that the police had told Jesse Perez that a witness had identified defendant, and Jona Cardona testified that defendant knew he had been identified.

We review for abuse of discretion the trial court's decision that the evidence was admissible under Evidence Code section 352. (*People v. Holloway, supra,* 33 Cal.4th at p. 134.) Other witnesses testified that defendant's motive in killing the victim was that he had identified defendant, but that did not render proof of the actual identification superfluous as to motive. Jona Cardona testified that, before the killing, defendant told her he had

---

[18] Because Flores's statements were admitted for a nonhearsay purpose, their admission did not, as defendant contends, violate the confrontation clause of the Sixth Amendment of the federal Constitution. "The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9 [158 L.Ed.2d 177, 124 S.Ct. 1354]; see *Tennessee v. Street* (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 105 S.Ct. 2078].)

committed a robbery at a gas station and wanted to obtain revenge on the victim because he had picked out defendant from a photograph and had his motorcycle license number. Shirley Chavez testified that defendant admitted he killed the victim because he had identified him. Evidence of the identification tended to corroborate the testimony of these other witnesses—witnesses whose credibility the defense vigorously challenged at trial. Furthermore, the risk that the jury would rely on the identification as proof of defendant's guilt of the robbery was low, because several other witnesses testified that defendant had admitted committing the robbery. The trial court did not abuse its discretion.

Defendant also contends the actual photo display from which the victim Flores made the identification was irrelevant and should have been excluded under Evidence Code section 352. Defendant argues the photo display was prejudicial because the jury could have interpreted defendant's photograph as a "mug shot" and could have concluded he had been previously arrested and had a criminal history. The trial court rejected that argument, ruling there was nothing about the photograph that would identify it as a "mug shot." Having reviewed the photograph at issue, we agree.

2. *Statements describing robbery and license plate number*

 Defendant further contends the trial court erred in admitting, as spontaneous declarations, victim Flores's hearsay statements concerning the robbery and the license plate number of the motorcycle used in the robbery. "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) We review for abuse of discretion the trial court's decision to admit evidence as a spontaneous declaration. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].)

The trial court conducted a hearing at which Officer Guerra testified that when she interviewed the victim Flores at the gas station on August 26, 1987, he appeared to be nervous. He said he had been robbed about 15 minutes earlier, described the robbery and robbers in some detail, and gave her the license plate of the motorcycle they were driving. The trial court concluded that Flores's statements to Officer Guerra were admissible as spontaneous declarations, and Officer Guerra testified concerning these statements at trial. In addition, Flores's supervisor, Eulalio Solorio, testified that on the day of the robbery, Mr. Flores called him at home, sounding scared. Flores told Mr. Solorio that he had just been robbed and that he had recorded the license number of the getaway motorcycle.

■■■■■■■■

The trial court's decision is sufficiently supported by the evidence. Mr. Flores described a robbery that he had personally perceived, shortly after it occurred. The court's conclusion that he was under the stress of the event at the time he made the statements is supported by the brief lapse of time before he made the statement, by Officer Guerra's statement that he seemed nervous, and by Mr. Solorio's statement that he sounded scared. That statements were made to Officer Guerro in response to her questions does not render the exception inapplicable. "Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance." (*People v. Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259].)

■■■■ Defendant contends that the admission of Mr. Flores's statements to the police regarding the robbery nevertheless violated his Sixth Amendment right to confront the witnesses against him. The confrontation clause applies to hearsay statements that are "testimonial" in nature, including statements made during police interrogation. (*Crawford v. Washington, supra,* 541 U.S. 36.) Such hearsay may be admitted at trial only if the declarant is unavailable and the defendant has had a previous opportunity to cross-examine the declarant. The high court recently concluded that hearsay statements are testimonial when made in the course of police interrogation and "the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. ___, ___ [165 L.Ed.2d 224, 126 S.Ct. 2266, 2273–2274].)

Assuming for the purposes of discussion that Mr. Flores's statements to Officer Guerra were made in response to interrogation and that their admission in this case violated defendant's Sixth Amendment rights, we conclude that any error was nevertheless harmless beyond a reasonable doubt.[19] To the extent that Officer Guerra's testimony tended to establish that Flores had been robbed and tended to connect defendant to that robbery, it was cumulative of other evidence. Mr. Solorio testified that the victim told him he had been robbed and had obtained the license plate number of the motorcycle used in the robbery. He also testified that $30 was missing from the gas station. Numerous other witnesses testified that defendant had admitted committing the robbery.

---

[19] Because we conclude that the admission of Mr. Flores's hearsay statements was harmless in any event, we do not address whether, because defendant was responsible for Mr. Flores's death, his statements were admissible under the rule of "forfeiture by wrongdoing," which the high court has recognized "extinguishes confrontation claims on essentially equitable grounds." (*Crawford v. Washington, supra,* 541 U.S. at p. 62; see *Davis v. Washington, supra,* 547 U.S. ___, ___ [126 S.Ct. at p. 2280].)

### H. *Admission of Witnesses' Prior Statements*

#### 1. *Santiago Ontiveros*

Defendant contends the trial court erred in admitting testimony regarding statements made by the witness Santiago Ontiveros during a police interview. When Ontiveros testified at trial, he denied that defendant had told him he was involved in a robbery or that Ontiveros had told anyone else that defendant had admitted being involved in a robbery. He further testified that he did not remember any conversation with a San Jose police officer in March of 1979. When the prosecutor asked him how he could flatly deny telling anyone that defendant had committed a robbery, but also testify that he did not remember what he told the police, he stated, "It's in my nature. I wouldn't tell anything to begin with."

Over a hearsay objection, a police officer testified that in March of 1979 he interviewed Ontiveros, who said that defendant had told him that defendant and Jesse Perez were involved in the robbery at the Hudson gas station. In addition, the prosecutor was permitted to play for the jury a portion of the tape-recorded interview during which Ontiveros told an officer that he did not know anything about the murder, but that defendant had told him that Jesse Perez was on the back of the motorcycle during the robbery. The trial court admitted the tape and the testimony as prior inconsistent statements. (Evid. Code, § 1235.)

A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement. (Evid. Code, §§ 770, 1235.) Defendant complains that the trial court failed to make a factual finding that Ontiveros's testimony was inconsistent with his prior statement, a prerequisite for the admission of those statements. No such explicit finding is required. "A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute." (Evid. Code, § 402, subd. (c); see *People v. Pinholster* (1992) 1 Cal.4th 865, 935 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Furthermore, Ontiveros's insistence that he never told anyone that defendant had admitted being involved in the robbery was plainly inconsistent with his prior statements to the officer.

#### 2. *Sylvia Lopez Ontiveros*

Defendant similarly challenges the admission of prior statements of Sylvia Lopez Ontiveros, Santiago's former wife, which also were admitted as prior inconsistent statements. Sylvia Ontiveros initially testified that she did not

remember having a conversation with defendant concerning a robbery or murder. Subsequently, she denied that he ever had told her he was going to kill someone. Ontiveros recalled speaking to a police officer in March of 1979, and she recalled testifying at the preliminary hearing in 1979. But she stated she did not remember what she testified about, and did not remember testifying that defendant had told her he had killed somebody. She did remember being in the district attorney's office during the last year and listening to a tape recording in which she was speaking to a man about defendant, but stated she did not remember many of the things she said on the recording. She did, however, admit that she might have said on the recording that defendant had killed the gas station attendant because the man was going to testify against him. She testified she did not want to be in court and admitted that when she was called to testify in a previous proceeding in the same case, she failed to appear and the police had to bring her to court.

After Ontiveros read a copy of her prior preliminary hearing testimony, she testified that she still did not remember her testimony or the conversations with defendant to which she had testified. She said she blanked things out because she did not want to think about them. Over defense objection, the prosecutor was permitted to have a portion of her preliminary examination testimony read to the jury. That testimony disclosed that defendant had told her he had killed someone who had identified him in a robbery, in order to eliminate the witness. She also testified at the preliminary hearing that, prior to the murder, she had overheard defendant tell her husband that he was thinking of getting rid of the witness because the witness had identified him. Evidence of statements made by Ontiveros during a police interview also were admitted over a hearsay objection. In the interview, she stated that defendant had told her, prior to the murder, that he wanted to get rid of the victim. She recounted that he later had told her he had shot the victim and had told "another guy" to "finish him off." Defendant also told her he felt that if he eliminated the victim, the police would not be able to press charges against him.

Defendant argues that the trial court failed to make a finding that Ontiveros's prior statements were inconsistent with her testimony. "Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. (*People* v. *Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 998].) However, . . . [w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. (*Id.* at pp. 988–989.) As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper. (*People* v. *O'Quinn* (1980) 109 Cal.App.3d 219, 225 [167 Cal.Rptr. 141].)" (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1219–1220 [14

Cal.Rptr.2d 702, 842 P.2d 1].) The requisite finding is implied from the trial court's ruling. (Evid. Code, § 402, subd. (c).)

Although Ontiveros consistently denied at trial being able to remember anything that defendant had told her, what she had told the police, or her prior testimony, the record provides a reasonable basis to conclude she was being evasive. (See *People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 78 [17 Cal.Rptr.3d 710, 96 P.3d 30].) She had been a friend of defendant's and admitted she was reluctant to testify and had failed to appear at a previous hearing. She claimed that even reading her prior testimony in full and listening to a tape recording of her police interview did not refresh her recollection.

## I. *Request to Enter Insanity Plea*

Defendant asserts the trial court erred in refusing to permit him to enter an insanity plea late in the trial. On August 30, 1989, during the defense surrebuttal, counsel made a motion to permit defendant to enter an insanity plea, based upon recent discussions counsel had had with defense experts. To establish good cause for a belated entry of the plea, defense counsel explained that until July 31, 1989, he had not received Dr. Morganthaler's report relating that defendant suffered from brain damage. That report caused him to reconsider the issue of sanity. Thereafter, counsel continued, he asked Dr. Evans and Dr. Rosenthal their opinions concerning defendant's sanity, and both indicated that defendant met the test for insanity established in *People v. Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318] (*Drew*).[20] The trial court denied the motion, concluding that defense counsel had not established good cause for the delay in seeking to enter an insanity plea.

---

[20] The murder was committed in early September of 1978, shortly before this court, in *Drew*, *supra*, 22 Cal.3d 333 (filed Sept. 26, 1978), rejected the long-standing *M'Naghten* test (*M'Naghten's Case* (1843) 10 Clark & Fin. 200 [8 Eng. Rep. 718]) for insanity in favor of the test proposed by the American Law Institute. Subsequently, in 1982, Proposition 8 was adopted by the voters, reinstating the *M'Naghten* test for crimes committed after the effective date of that initiative measure. (See *People v. Skinner* (1985) 39 Cal.3d 765, 768 [217 Cal.Rptr. 685, 704 P.2d 752] [Proposition 8 reinstated the *M'Naghten* test for insanity]; *People v. Smith* (1983) 34 Cal.3d 251, 263 [193 Cal.Rptr. 692, 667 P.2d 149] [Proposition 8 does not apply to crimes committed before June 9, 1982].) Defendant contends that the *Drew* test is applicable to his case because the crimes occurred before the effective date of Proposition 8. The Attorney General contends that the *M'Naghten* test applies because the crimes occurred before the *Drew* decision. The Attorney General contends that the *Drew* test applies only to those crimes that occurred after the *Drew* decision but before the reinstatement of the *M'Naghten* rule in Proposition 8. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 62 [5 Cal.Rptr.2d 495, 825 P.2d 388] [requirement that intent to kill be proved as element of felony-murder special circumstance applies only to offenses committed on or after the date of the decision in *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d

The trial court's ruling on the issue of good cause is reviewed for abuse of discretion. (*People v. Montiel* (1993) 5 Cal.4th 877, 923 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) We find no such abuse. As we have noted, the *Drew* test for insanity is very similar to the defense of diminished capacity. (*People v. Cruz* (1980) 26 Cal.3d 233, 251 [162 Cal.Rptr. 1, 605 P.2d 830]; *People v. Wetmore* (1978) 22 Cal.3d 318, 330–331 [149 Cal.Rptr. 265, 583 P.2d 1308].) Under the *Drew* test, a person is legally insane if " 'as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*Drew, supra,* 22 Cal.3d at p. 345.) Defense counsel had fully prepared a diminished capacity defense and therefore should have been well aware of the possibility of an insanity defense.

Furthermore, if there was error it was harmless. The jury heard an extensive presentation of evidence regarding defendant's mental state at the time of the crimes. Indeed, defense counsel told the trial court that if an insanity plea were permitted, he would present very little additional evidence; an insanity trial would focus upon specific questions related to the standard for insanity and the experts' opinions on that subject. Accordingly, we discern no reasonable probability that the jury would have accepted a defense of insanity based upon its consideration of essentially the same evidence that it considered on the very similar issue of diminished capacity. (See *People v. Cruz, supra,* 26 Cal.3d at p. 252 [finding no prejudice from failure to instruct on the *Drew* test for insanity rather than the stricter *M'Naghten* test, because in rejecting the diminished capacity defense "the jury necessarily rejected the evidence that might support a verdict that defendant not only had diminished capacity but was legally insane"].)[21]

## J. *Rebuttal Testimony of Dr. Coleman*

Defendant contends that the trial court erred in admitting the rebuttal testimony of Dr. Lee Coleman because that evidence encouraged the jury to nullify the diminished capacity defense and to ignore defendant's mental state and convict him based upon his acts alone, and because that testimony was irrelevant and inherently prejudicial, and denied him due process.

---

862], which adopted the intent requirement, and before the date of the decision in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], which overruled *Carlos*].) In view of our conclusion that the trial court's denial of defendant's motion to enter an insanity plea, if error, was harmless, we need not resolve this issue.

[21] Because we conclude that the court's denial of defendant's motion to permit entry of an insanity plea was not prejudicial, defendant's claim that his counsel rendered ineffective assistance in failing to investigate and present such a defense in a timely manner must fail.

Defendant's claim was forfeited by counsel's failure to object in the trial court. Defense counsel did object to Dr. Coleman's giving a general opinion on the reliability of testimony from psychiatrists and psychologists. The court agreed that his testimony should be directed to the expert testimony given in this case, and sustained objections when Dr. Coleman appeared to be giving a general opinion concerning psychological evidence not specifically related to the present case. But defense counsel did not object to Dr. Coleman's giving a specific opinion concerning the reliability of the particular methods used by the defense experts or their conclusions concerning defendant's mental state. In the course of his testimony, Dr. Coleman sometimes explained his opinions on particular matters by reference to his more general views that psychological methods lack reliability and relevance in the context of legal proceedings, but defense counsel did not object to this testimony.

Furthermore, even if defense counsel had objected on the grounds now urged by defendant, we would find no error. In several cases, we have upheld the admission of testimony by Dr. Coleman similar to the testimony he gave at defendant's trial. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 965–969 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Clark, supra,* 5 Cal.4th at p. 1019; *People v. Danielson* (1991) 3 Cal.4th 691, 728–731 [13 Cal.Rptr.2d 1, 838 P.2d 729].) In *Smithey,* we fully considered and rejected the arguments defendant raises here. We find nothing in the present case to distinguish it from these prior decisions, nor do we find any reason to reconsider our previous conclusions related to such testimony.

### K. *Jury Instructions*

#### 1. *Failure to instruct on theft as a lesser included offense of robbery*

Defendant contends the trial court erred in failing to instruct the jury on the lesser offense of theft regarding the September robbery. Defendant argues there was substantial evidence from which the jury could have concluded that the intent to steal from the victim was not formed until after the murder, making the offense theft rather than robbery.[22] We agree, and conclude this error requires reversal of defendant's conviction for the September robbery (count three) and the robbery special circumstance finding.

---

[22] Defendant also argues that the trial court was required to instruct on conspiracy to commit theft, because that offense is necessarily included in robbery, and the court instructed on conspiracy to commit robbery. (See *People v. Horn* (1974) 12 Cal.3d 290, 297 [115 Cal.Rptr. 516, 524 P.2d 1300]; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1706 [54 Cal.Rptr.2d 608] [court must instruct on any lesser offenses "which the jury could reasonably find to be the true objects of the conspiracy"].) The conspiracy instruction was given as a possible basis for finding defendant vicariously liable for offenses committed in furtherance of the conspiracy. Because conspiracy to commit robbery was not a charged offense, there was no need for instructions on lesser included offenses. Furthermore, defendant points to no evidence that

 Theft is a necessarily included offense of robbery. (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) "It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." (*Ibid.*) If there is evidence to support a finding that the defendant did not form the intent to steal until after the killing, the court should instruct on its own motion on the lesser included offense of theft. (*People v. Webster* (1991) 54 Cal.3d 411, 443–444 [285 Cal.Rptr. 31, 814 P.2d 1273].) In *Webster*, the defendant testified that he decided to take the victim's property only after he had struggled with and stabbed the victim. We stated that although he was not entitled to a "pinpoint" instruction on after-formed intent in the absence of a request, he was entitled to an instruction on theft as a lesser included offense of robbery (which he received). (*Ibid.*)

The evidence in defendant's case warranted an instruction on theft as a lesser included offense of robbery. The prosecution's theory was that defendant stole the victim's boots and his money shortly before or after the killing.[23] The evidence presented by the prosecution, however, overwhelmingly supported the conclusion that the primary motive for the killing was to prevent the victim from testifying that defendant committed the August gas station robbery. The prosecution's witnesses testified that defendant had stated before the killing that he wanted to kill the victim out of revenge and to prevent his testimony, but there was no reference to robbing him. None of the evidence related to the admissions made by defendant after the killing mentioned any intent to steal the victim's property. The only reference to a taking in these admissions was defendant's comment that Jesse Perez had stolen the victim's boots. Although the jury could have concluded, on this evidence, that defendant killed the victim both with the intent to eliminate him as a witness and to steal his property, it instead could have readily concluded that the evidence was insufficient to prove that any intent to steal was formed before the killing. Under these circumstances, the trial court should have instructed the jury on the lesser included offense of theft.

reasonably would have supported a jury finding that defendant engaged in conspiracy to commit theft but not conspiracy to commit robbery.

[23] The prosecution also alleged that defendant took a tapestry that had been hanging in the gas station. On appeal, however, the Attorney General does not argue that the evidence was sufficient to support a conviction for robbery related to the taking of the tapestry, and we agree with this apparent concession. Evidence was presented that, three or four days after Mr. Flores disappeared, his manager noticed the tapestry was missing. However, the gas station had been open during this period and there was no evidence concerning how long the tapestry was missing, nor any evidence that defendant or any of his alleged accomplices had the tapestry in their possession.

An erroneous failure to instruct on a lesser included offense requires reversal of a conviction if, taking into account the entire record, it appears " 'reasonably probable' " the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In defendant's case, there was strong, explicit evidence that defendant's purpose in killing the victim was to eliminate him as a witness to the August robbery, and the jury found true the witness-killing special circumstance. On the other hand, although the jury could have inferred that defendant formed the intent to rob before the killing, the evidence supporting such an inference was weak. Under these circumstances, it seems reasonably likely the jury would have found defendant guilty of theft rather than robbery had it been presented with that alternative. Therefore, we must reverse defendant's conviction for the September robbery and set aside the true finding on the robbery special circumstance.

Defendant argues that reversal of his murder conviction also is required, because the jury could have relied upon the theory of felony murder committed during a robbery to convict him of first degree murder. We disagree. The jury's true finding on the witness-killing special circumstance demonstrates that it found the murder to be deliberate and premeditated. (See former § 190.2, subd. (c)(2), added by Stats. 1977, ch. 316, § 9, pp. 1257–1258 [witness-killing special circumstance requires willful, deliberate, and premeditated killing].) Accordingly, we may reasonably conclude the jury would have found defendant guilty of first degree premeditated murder even had it concluded he committed theft rather than robbery. (Cf. *People v. Ramkeesoon, supra,* 39 Cal.3d at p. 352, fn. 2 [failure to instruct on theft as lesser included offense of robbery required reversal of the defendant's first degree murder conviction because court had "no way of knowing whether the jury relied on [a felony-murder] theory or on premeditation and deliberation"].)

Defendant further argues that reversal of the robbery special circumstance requires reversal of his death sentence. We disagree. The jury's death sentence is supported by the witness-killing special circumstance. Under circumstances similar to those of this case, we held the reversal of a robbery conviction and the setting aside of a robbery special-circumstance finding not to require reversal of the death penalty imposed in *People v. Kelly* (1992) 1 Cal.4th 495, 551 [3 Cal.Rptr.2d 677, 822 P.2d 385]. In defendant's case, as in *Kelly*, "if the jury found defendant first intended to steal the [victim's property] after death, but nevertheless erroneously convicted him of robbery, it would not have given significant weight to that conviction or to the robbery special circumstance." (*Kelly, supra,* 1 Cal.4th at p. 551; see *Brown v. Sanders* (2006) 546 U.S. 212 [163 L.Ed.2d 723, 126 S.Ct. 884] [invalidation of two special circumstances did not render death sentence unconstitutional when other, valid special circumstances rendered the defendant eligible for the

death sentence, and evidence admitted to establish the invalid circumstances nevertheless was admissible and properly considered by the jury].) We find no reasonable possibility that the jury would have reached a different penalty verdict had it not considered the robbery special circumstance.[24]

### 2. *Definition of malice*

Defendant complains that the jury instruction on malice defined that word as "intent to kill," without explaining that the concept of malice (at the time of defendant's offenses) also included the ability to comprehend the duty to comply with the law and the ability to act in accordance with that duty. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1110–1111 [2 Cal.Rptr.2d 364, 820 P.2d 588]; *People v. Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342]; *People v. Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].) We conclude that the instructions, taken as a whole, fully conveyed these requirements.

The jury in the present case was told that murder requires proof of malice, and that "malice is express when there is manifested an intention unlawfully to kill a human being." (CALJIC No. 8.11.) In instructing the jury on the lesser offense of voluntary manslaughter, the court explained: "There is no malice aforethought if the evidence shows that due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not have the capacity to form the mental state constituting malice aforethought, even though the killing was intentional, voluntary, deliberate, and unprovoked." (CALJIC No. 8.41.) The jury further was told that if it found that defendant's mental capacity was substantially reduced at the time of the offense, "you must consider what effect, if any, this diminished mental capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder . . . . [I]f you find the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental state constituting express malice aforethought, you cannot find him guilty of murder . . . . If you have a reasonable doubt whether he was able to form an intention unlawfully to kill a human being, or whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or whether he did act despite that awareness, you cannot find that he harbored express malice." (CALJIC No. 8.77.)

We reject defendant's argument that the jury, by focusing upon the initial definition of express malice, might have concluded that defendant was guilty

---

[24] In light of these conclusions, we do not address defendant's other claims related to the September robbery charge.

of murder as soon as it concluded he intended to kill, without further considering whether diminished capacity negated malice. The jury was instructed: "Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others." We presume the jury followed these instructions. (See *People v. Sanchez* (2001) 26 Cal.4th 834 [111 Cal.Rptr.2d 129, 29 P.3d 209].)

### 3. *Failure to instruct on diminished capacity in relation to uncharged conspiracy and special circumstances*

At the prosecution's request, the jury was instructed on the uncharged crime of conspiracy and on vicarious liability for a killing committed in furtherance of a conspiracy to commit a robbery or kidnapping. Defendant contends the trial court erred in failing to instruct, on its own motion, that the defense of diminished capacity applied to the mental state required for conspiracy, and he claims this error requires reversal of his conviction for murder and the September robbery.

Even assuming the instructions did not adequately cover the applicability of diminished capacity to the theory of conspiracy, we agree with the Attorney General's argument that any error was harmless. The jury's verdicts on the special circumstance and firearm allegations demonstrate that it did not rely upon a theory of vicarious liability. The jury was instructed that before it could find the special circumstance allegations to be true, it had to find that defendant was "personally present during the commission of the act or acts causing death" and that he "physically aided or committed the act or acts causing death." (See former § 190.2, subd. (c), added by Stats. 1977, ch. 316, § 9, p. 1257.) The jury was instructed that before it could find the allegations that defendant personally used a firearm to be true, it had to find defendant "personally used a firearm in the commission of" each felony. The jury found true the alleged special circumstances, as well as the personal-firearm-use allegations as to all counts—murder, kidnapping, and robbery. Because the jury found that defendant personally had participated in the robbery and in the acts causing death, any defects in the instructions pertaining to vicarious liability for crimes arising out of a conspiracy could not have affected its verdicts.

Defendant similarly contends the trial court erred in failing to instruct that the defense of diminished capacity applied to the mental states required for the special circumstance allegations. Although the instructions on the special circumstances did not specifically delineate how the defense of diminished capacity related to the particular mental states required to prove those allegations, the jury was generally instructed that for both the crime of

murder and the special circumstances alleged, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed." (CALJIC No. 3.31.) Furthermore, the jury was instructed that intent is shown not only by a statement of intent and the circumstances surrounding the act, but also by "the sound mind and discretion of the person committing the act." (CALJIC No. 3.34.) Finally, even if these instructions were inadequate in some way, the jury's rejection of the defense of diminished capacity in relation to the murder charge demonstrates that any error was harmless.

### 4. Refusal of instruction that voluntary intoxication may negate mental state of aider and abettor

The defense proposed, and the trial court rejected, an instruction that the jury could consider the effect of intoxication on the "intent or purpose either of committing, or of encouraging or facilitating the commission of, the offense." Defendant contends the trial court erred in refusing this instruction because the jury was not otherwise informed that it could consider the effects of intoxication on the mental state required for liability as an aider and abettor. He asserts this alleged error requires reversal of his conviction for murder.

We find no error. Defendant's jury was instructed that it could consider the effects of intoxication on "defendant's ability to form any of the specific mental states that are essential elements of murder" (CALJIC No. 8.77) and that it should consider "his state of intoxication in determining if the defendant had [the] specific intent or mental state" required for murder. (CALJIC No. 4.21.) The jury was informed that liability as an aider and abettor required that defendant act "with the intent or purpose of committing, encouraging, or facilitating the commission of the crime." (CALJIC No. 3.01.) Considering the instructions as a whole, a reasonable juror would have understood that the intent element required in order to find defendant guilty of the crime of murder under the aiding and abetting instructions was a "specific intent or mental state" to which defendant's state of intoxication was relevant. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1016–1017 [68 Cal.Rptr.2d 648, 945 P.2d 1197] [a jury that was instructed to consider evidence of intoxication in determining whether the defendant possessed the required specific intent or mental state at the time of the commission of the crime would have reasonably understood deliberation and premeditation to be "mental states" for which it should consider the evidence of intoxication].)

Furthermore, even if the instructions did not adequately address the relevance of intoxication to aider and abettor liability, there was no prejudice.

As discussed above, the jury's findings on the special circumstances and the firearm-use allegations demonstrate that it did not rely upon a theory of accomplice liability to convict defendant of murder.

### 5. *Refusal of proposed pinpoint instructions*

Defendant asserts that the trial court erred in refusing to give instructions, requested by defendant, that he could not be convicted upon "mere suspicion" and that mere opportunity to commit the crime is insufficient proof of guilt. These proposed instructions are restatements of the requirement that guilt be proved beyond a reasonable doubt, a requirement that was fully explained to the jury in other instructions. Therefore, the trial court did not err in refusing them. (*People v. Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049].)[25]

Nor did the court err in refusing an instruction that directed the jury to consider, for the purpose of determining whether there was reasonable doubt as to defendant's guilt, evidence that another person had the motive or opportunity to commit the crime. A defendant is entitled, upon request, to a nonargumentative instruction that pinpoints his or her theory of the case. (*People v. Wright, supra*, 45 Cal.3d 1126, 1135–1136.) An instruction that directs the jury to " 'consider' " certain evidence is properly refused as argumentative. (*Id.* at p. 1135.) "In a proper instruction, '[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case.' " (*Id.* at p. 1137, quoting *People v. Adrian* (1982) 135 Cal.App.3d 335, 338 [185 Cal.Rptr. 506].)

Defendant also requested that the jury be instructed that if evidence tending to prove that a party other than defendant committed the crime raises a reasonable doubt as to defendant's guilt, the jury must find him not guilty. This instruction was arguably an appropriate "pinpoint" instruction of the type that focuses upon the defendant's theory of the case and should be given upon request. (See *People v. Wright, supra*, 45 Cal.3d at pp. 1137–1138.) But even if the trial court erred in refusing it, any error was harmless. The jury was instructed on the prosecution's burden of proving guilt beyond a reasonable doubt and was instructed specifically that if it entertained a doubt concerning whether defendant was present at the time the crime was committed, it would have to find him not guilty. The jury also was instructed that to prove the witness-killing special circumstance, the prosecution had to prove that defendant physically aided or committed the act or acts causing death. These instructions adequately addressed the prosecution's burden of proving

---

[25] For the same reason, we also reject defendant's argument that the court erred in failing to instruct the jury, on its own motion, that the presence of motive and opportunity, without more, is insufficient to establish identity.

beyond a reasonable doubt that defendant perpetrated the crimes charged. (See *People v. Adrian, supra,* 135 Cal.App.3d at p. 342 [refusal of pinpoint instruction on defense claim of self defense was harmless where other instructions adequately conveyed that the prosecution had the burden of disproving the defense beyond a reasonable doubt]; *People v. Gomez* (1972) 24 Cal.App.3d 486 [100 Cal.Rptr. 896] [refusal of instruction on reasonable doubt regarding accuracy of identification was harmless where instruction on alibi called to the jury's attention the necessity of finding beyond a reasonable doubt that the defendant was present when the offense was committed].)

### 6. *Corpus delicti instruction*

The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1181 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Defendant contends the trial court erred by instructing the jury on the corpus delicti rule in the language of CALJIC No. 2.72. This instruction required that there must be "some proof" of each element of the crime independent of defendant's extrajudicial admissions. Defendant asserts that the instruction should have required the jury to find proof of each element of the crime to a "reasonable probability." The instruction given is consistent with the law. "[T]he modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1181.) Defendant cites no authority supporting his contention that the jury must be instructed on a "reasonable probability" standard.

Defendant also contends the trial court erred in instructing that identity is not an element of the crime that must be established independent of defendant's extrajudicial admissions. Defendant asks this court to declare, as a judicial rule of criminal procedure or as a matter of due process, that the corpus delicti rule applies to proof of identity. Defendant provides no sound reason for this court to depart from the long-established principle that the corpus delicti rule does not require independent proof that the defendant is the perpetrator of the crime. (See, e.g., *People v. Jones* (1898) 123 Cal. 65, 68 [55 P. 698] ["[I]t is not necessary that the evidence of the *corpus delicti* should itself connect the defendant with its perpetration"].) The principal purpose of the corpus delicti rule is to ensure that a defendant is not convicted of a crime that never occurred. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394 [63 Cal.Rptr.2d 1, 935 P.2d 708]; see *People v. Jennings, supra,* 53 Cal.3d 334, 368.) That purpose is fulfilled by the admission of evidence sufficient to establish that the crime occurred.

## L. *Proof of Corpus Delicti*

Defendant contends his convictions for the August robbery and for kidnapping must be reversed because the prosecution failed to establish the corpus delicti of these crimes independent of defendant's extrajudicial statements. As noted above, however, the quantum of evidence required is not great, and "need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1181.) "The inference [that a crime has been committed] need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one.' " (*People v. Jones* (1998) 17 Cal.4th 279, 301–302 [70 Cal.Rptr.2d 793, 949 P.2d 890], quoting *People v. Jennings, supra,* 53 Cal.3d 334, 367.)

Under these standards, there was sufficient evidence to establish the corpus delicti of the August robbery and of the kidnapping. The testimony of victim Flores's supervisor that Flores had told him he had been robbed was, as discussed above, admissible, and it was sufficient to establish the corpus delicti of robbery. The circumstances surrounding the murder of Mr. Flores—as noted, he disappeared from the gas station during the middle of his shift, leaving it open and unattended, and his body was discovered later many miles away—were sufficient to establish a reasonable inference that he had been kidnapped.

## M. *Sufficiency of Evidence of First Degree Murder*

Defendant contends his murder conviction must be reversed because the evidence was insufficient to prove malice or deliberation and premeditation. He argues the evidence was insufficient because the prosecution provided no response to the testimony of the defense experts that, due to the effect on his brain of PCP use, defendant lacked the capacity to form these mental states. He contends that the testimony of the prosecution expert Dr. Coleman that the requisite mental state could be inferred from defendant's acts was insufficient to rebut the testimony of the defense experts.

In resolving such a claim, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; see also *People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262].) Contrary to defendant's contention, the jury was not required to accept the testimony of the defense experts. "The value of an expert's opinion depends upon the quality of the

material on which the opinion is based and the reasoning used to arrive at the conclusion." (*Marshall, supra,* 15 Cal.4th at pp. 31–32.) The jury could have found the defense experts' reasoning to be flawed, or could have found an insufficient basis for concluding that defendant was under the influence of PCP at the time of the crimes.

The jury also could have concluded that the defense experts' opinions regarding defendant's state of mind were inconsistent with the circumstances of the offense as described in defendant's admissions—which indicated that defendant planned and carried out a plot to kidnap the victim, transport him to a remote location, and kill him to prevent him from testifying—and with his conduct in fleeing the state after the crime. Those circumstances are certainly sufficient to support the jury's conclusion that defendant was capable of forming, and did form, the intent to kill and that the murder was deliberate and premeditated.

### N. Sufficiency of Evidence of Witness-killing Special Circumstance

Defendant contends the evidence is insufficient to support the jury's finding that "the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding." (Former § 190.2, subd. (c)(2), added by Stats. 1977, ch. 316, § 9, pp. 1257, 1258.) He asserts the evidence, instead, supports the conclusion that the killing was for the purpose of revenge or to prevent defendant's arrest.

We uphold the jury's verdict if there is any substantial evidence to support it. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Sylvia Ontiveros specifically testified that defendant said that if he "got rid of the witness, he wouldn't have a witness to testify against him." The circumstances of the offense also support the conclusion that the victim was killed to prevent his testimony. At the time of the killing, defendant was aware that he had been identified and that the police were seeking to arrest him. Defendant contends other evidence suggests that defendant's intent was to exact revenge or to prevent his arrest—he stresses his threat to the victim not to "narc" on him, defendant's comment that he killed the victim even though the victim did not recognize defendant ("just in case"), his statement that he wanted to kill the victim for revenge, and his statement that he killed because he did not want to get caught. These statements, however, are not inconsistent with the conclusion that defendant intended to prevent the witness from testifying. (See *People v. Sanders* (1990) 51 Cal.3d 471, 520 [273 Cal.Rptr. 537, 797 P.2d 561] [evidence was sufficient to support witness-killing special circumstance when, shortly after a robbery attempt, the defendant expressed concern that one of the victims

could identify him].) Furthermore, the witness-killing special circumstance is not inapplicable merely because the defendant might have had more than one reason to kill. (*Id.* at p. 519.)

Defendant also contends the witness-killing special circumstance is inapplicable to his case because the killing of Flores was part of the August gas station robbery. The witness-killing special circumstance applies only if "the killing was not committed during the commission . . . of the crime . . . ." (Former § 190.2, subd. (c)(2), added by Stats. 1977, ch. 316, § 9, pp. 1257, 1258.) The witness-killing special circumstance applies here because the August 26 robbery was long completed at the time of the murder, which took place no sooner than September 5. The case of *People v. Fields, supra,* 35 Cal.3d 329, on which defendant relies, does not support his contention. In *Fields,* we concluded that the robbery victim was killed during the commission of a robbery even though the killing occurred several hours after the defendant had forced the victim to write him a check. We noted that the defendant's motive in killing the victim, to prevent her from reporting the crime and to punish her for attempting to frustrate the robbery, served to link the two crimes. (*Id.* at p. 368.) But we also pointed out that "[s]uch motives would not enable a court to find a killing occurred during the commission of a robbery if it took place days later and in a far distant locale." (*Ibid.*) In *Fields,* the murder was committed only a few hours after the robbery and, importantly, during that period of time the defendant continued to have "control over the victim, forcing her to remain at his house [where the robbery took place] and then transporting her to the murder site." (*Ibid.*) The facts of the present case are entirely different. More than one week passed between the robbery and the killing of the victim, and defendant did not have continuous control over the victim during that period.

### O. *Constitutionality of Witness-killing Special Circumstance*

Defendant contends that the witness-killing special circumstance is unconstitutional under the Eighth and Fourteenth Amendments to the federal Constitution because it fails to reasonably distinguish between persons who deserve the death penalty and those who do not. In essence, defendant argues that the witness-killing special circumstance under the 1977 death penalty law is underinclusive because it applies only to witnesses in criminal, not juvenile proceedings; it applies only to killings to prevent testimony, not to prevent a crime report or arrest; and it applies only to killings to prevent future testimony, not killings in retaliation for actual testimony. (Compare former § 190.2, subd. (c)(2) with current § 190.2, subd. (a)(10) [special circumstance applicable to killing of a witness to prevent or retaliate for testimony in a criminal or juvenile proceeding].)

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 103 S.Ct. 2733].) The witness-killing special circumstance serves this function by reasonably assigning greater culpability to those who kill in order to prevent a witness from testifying. Furthermore, the Legislature's decision to single out for greater punishment those who kill in order to prevent testimony at a criminal proceeding is not, as defendant contends, entirely arbitrary. Because juveniles are not subject to the death penalty and the consequences of juvenile proceedings generally are less severe than those of a criminal prosecution, the Legislature reasonably could have concluded that murders of witnesses in criminal proceedings posed a greater threat. It also could have reasonably concluded that a murder to prevent future testimony should be treated more seriously than a retaliatory killing because such a killing would undermine the underlying criminal prosecution. A special circumstance is not unconstitutional merely because it does not apply to every defendant who may be otherwise deserving of the death penalty.

Alternatively, defendant argues that the witness-killing special circumstance is unconstitutionally vague, because a jury might apply it more broadly than the Legislature intended—for example, to a killing committed for purposes of revenge or avoiding arrest. We find no merit in this argument. A statute defining a special circumstance is not vague if the ordinary meaning of its language adequately communicates the parameters of the statutory requirements. (*People v. Estrada* (1995) 11 Cal.4th 568, 581 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) The special circumstance applies if the murder was "willful, deliberate, and premeditated" and if the victim was "intentionally killed for the purpose of preventing his testimony in any criminal proceeding." (Former § 190.2, subd. (c)(2), added by Stats. 1977, ch. 316, § 9, pp. 1257, 1258.) In *People v. Sanders, supra,* 51 Cal.3d 471, the defendant argued that the instructions that were given concerning the offense of dissuading a witness from testifying confused the jury regarding the elements of the witness-killing special circumstance. We stated that because the instruction on the witness-killing special circumstance, which was given in the language of the statute, expressed its meaning "in such a straightforward manner, we find the possibility that the jury sustained the special circumstance without finding these explicit elements is quite remote." (*Sanders, supra,* 51 Cal.3d at p. 518.) Because the words in the witness-killing special circumstance statute can be readily understood and applied, it is not unconstitutionally vague.

Finally, defendant contends that the witness-killing special circumstance is unconstitutional because it does not include a requirement that the defendant

kill with malice aforethought. The special circumstance requires that the defendant physically aid or commit the act causing death and that the killing be intentional, deliberate, and premeditated. (Former § 190.2, subd. (c)(2).) These elements satisfy constitutional requirements. (See *Cabana v. Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 106 S.Ct. 689] [Eighth Amendment is satisfied so long as the defendant killed, attempted to kill, or intended to kill]; *People v. Anderson, supra,* 43 Cal.3d 1104, 1140 [Constitution does not require that felony-murder special circumstance provide that actual killer intended to kill].)

### P. *Prosecutor's Closing Argument*

Defendant contends the prosecutor committed misconduct in numerous ways during his closing argument and rebuttal argument at the guilt phase, in violation of California law and defendant's right to a fair trial under the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15 of the California Constitution. A prosecutor's conduct violates the federal Constitution only when it is " ' "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis, supra,* 9 Cal.4th 1196, 1214; see *People v. Espinoza, supra,* 3 Cal.4th 806, 820.) A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*Espinoza, supra,* 3 Cal.4th at p. 820.) A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*).) Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. (*People v. Medina, supra,* 11 Cal.4th 694, 761; *People v. Fierro* (1991) 1 Cal.4th 173, 211 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Ratliff* (1986) 41 Cal.3d 675, 690 [224 Cal.Rptr. 705, 715 P.2d 665].)

During the prosecutor's argument, defendant moved for a mistrial based upon three comments made by the prosecutor. Even if defendant has preserved these claims despite his failure to request that the trial judge admonish the jury to ignore them, we conclude that none of the comments amounted to misconduct under state law; much less did they render the trial fundamentally unfair. (See *People v. Medina, supra,* 11 Cal.4th at p. 761.) First, defendant contends the prosecutor's reference to the absence of remorse was an improper comment on defendant's failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. The

prosecutor noted that defendant had bragged about the murder and commented, "the quality of defendant's remorse is notable only in its absence." After defense counsel unsuccessfully moved for a mistrial based on this statement, the prosecutor explained to the jury why he had referred to defendant's lack of remorse, explaining that his point was a response to the defense's theory that defendant had bragged about the crimes to impress other persons but had not actually committed them. The prosecutor's argument was that defendant was bragging about the crimes because he lacked remorse, "and that explains why he conducted himself in the manner that he did." There is no reasonable likelihood that the jury would have understood these remarks as a comment upon defendant's failure to testify. (See *Medina, supra,* 11 Cal.4th at p. 755; *People v. Clair* (1992) 2 Cal.4th 629, 662 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Second, defendant argues that the prosecutor vouched for the credibility of witness Jona Cardona by referring to facts outside the record. Responding to the testimony of a defense witness who claimed to have had sex with Ms. Cardona and heard her make remarks allegedly inconsistent with her trial testimony, the prosecutor commented, "If he knew Jona in that way . . . why didn't he know about her tattoos?" This argument was based on Ms. Cardona's testimony, not on evidence outside the record. She denied knowing the witness, and stated: "He would have seen [my tattoos] if I went to bed with him, he could tell you where they were at. He wasn't there with me in bed, or he could have told you about the distinguishing marks, right?" Although that testimony was in the form of rhetorical questions, it constituted evidence that Cardona had distinguishing tattoos. In this context, the prosecutor's comment was not improper.

Third, defendant complains the prosecutor attempted to bolster his own credibility by informing the jury that he taught at a law school. Before explaining the instructions on circumstantial evidence, the prosecutor mentioned that he taught a law school class on evidence and that when he reads these instructions to law students they often have difficulty understanding them. The prosecutor explained he would help the jurors make sense of the instructions by breaking them down. We find it inconceivable that this comment could have improperly influenced the jury.

As to two additional instances of alleged misconduct to which defendant objected at trial, the trial court admonished the jury, dispelling any possibility of prejudice. First, defendant contends the prosecutor improperly argued that victim Flores's identification of defendant could be considered evidence of defendant's guilt of the August robbery. The prosecutor enumerated all of the circumstantial evidence against defendant related to the August robbery charge, as well as defendant's admissions. When the prosecutor mentioned

that Flores had identified one of the robbers in a photographic lineup, defense counsel objected. The trial court reminded the jury that the victim identification was admitted only to show motive for defendant's actions to the extent that he became aware of the identification, and that the evidence was not admitted to prove the truth of the identification. Contrary to defendant's contention, the prosecutor did not ignore the court's admonition; his comments after that point referred only to circumstantial evidence demonstrating that defendant was told he had been identified.

Second, defendant asserts that the prosecutor improperly stated that the testimony of the defense experts was inconsistent. At trial, defense counsel objected that the prosecutor had misstated the facts. The court admonished the jury that if facts are misstated during argument, the jurors must rely on their recollection or can have recourse to the reporter's notes.

Defendant also cites numerous examples of alleged prosecutorial misconduct to which he did not object at trial. As to these instances, the issue has been forfeited. (*People v. Medina, supra,* 11 Cal.4th at p. 755.) Having reviewed the entire argument of the prosecutor, we do not find his comments, even if they were to be characterized as misconduct, to be so pervasive that an objection and admonition would not have cured the ensuing harm. (See *People v. Clair, supra,* at pp. 685–686; cf. *People v. Bandhauer* (1967) 66 Cal.2d 524, 530 [58 Cal.Rptr. 332, 426 P.2d 900].) Although we need not and do not address the merits of each of these various forfeited subclaims, we note that the prosecutor did make some inappropriate comments questioning defense counsel's ethics. For example, the prosecutor stated that there had been a "concerted effort in this case to introduce things for your consideration that were introduced perhaps by inappropriate questions. I think you know what I am referring to." Such comments, however, were neither egregious nor pervasive.

Nor do we find any reason to believe that objections to any misconduct would have been futile. This case is distinguishable from *Hill, supra,* 17 Cal.4th 800, in which we reviewed claims of misconduct despite defense counsel's failure to object to some of them because additional attempts to object "would have been futile and counterproductive to his client." (*Id.* at p. 821.) In *Hill,* we found that if defense counsel had continued to object, he would have risked "repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting Blum was an obstructionist, delaying the trial with 'meritless' objections." (*Ibid.*) In contrast, the trial judge in the present case ruled on defense counsel's objections with admirable patience and equanimity.

### Q. *Permitting Jurors to Think About the Case at Home*

At the end of the first day of jury deliberations, the foreperson asked the court if she could take the instructions home with her to read. The court told her she could "as long as you don't communicate any thought you may develop concerning that with anyone else while you are separated." Similarly, when excusing the jury for the day, the court admonished the jurors that they could continue to think about the case, but they could not communicate their thoughts to anyone until they were back together for deliberations.

Defendant contends that permitting the foreperson to read instructions at home and permitting all the jurors to think about the case after they separated violated California statutory law as well as defendant's right to a jury trial under the Sixth and Fourteenth Amendments to the federal Constitution and article I, sections 5, 15, and 16 of the California Constitution. We note, first, that the issue has been forfeited because counsel failed to object in a timely manner. Defense counsel did not object when the foreperson was told she could take the instructions home, but moved for a mistrial the following morning on the ground that jurors may not be permitted to deliberate while separated. The court denied the motion, explaining that the foreperson is required to guide the jurors through their deliberations and that it would assist them if she were aware of the context of the instructions they would cover during their deliberations. The court also noted that defense counsel could have asked to speak to the court outside the presence of the jury if he wished to object. At the end of the third day of deliberations, the foreperson again asked to take the instructions home. The court asked all counsel whether they had any objections, and none did. The court again cautioned the foreperson not to discuss the instructions with anyone and admonished her not to look up any words she did not understand.

■■■ Even had the issue not been forfeited, we would find no error. Defendant equates thinking about the case with jury deliberations. Jurors must be admonished not to form an opinion concerning the case or to discuss it with anyone before it is submitted to them. (§ 1122.) Once the case has been submitted to the jurors for decision, they may not deliberate except when all are together. (§ 1128.) Although the deliberation process of course includes thinking, defendant has failed to cite any authority suggesting that jurors must be directed not to think about the case except during deliberations. A juror participates in the deliberative process by "participat[ing] in discussions with fellow jurors by listening to their views and by expressing his or her own views." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Indeed, it would be entirely unrealistic to expect jurors not to think about the case during the trial and when at home. (See *U.S. v. Steele* (9th Cir. 2002) 298 F.3d 906, 911 [noting that jurors who

reached a verdict on Monday morning may have come "to a resolution during a weekend when they individually pondered the evidence"].)[26]

Defendant also contends the trial court made comments that elevated the status of the foreperson, thereby improperly increasing her influence over the other jurors. On the third day of deliberations, the court told the jurors that they must not remove anything from the jury room, including the instructions. The court noted that the foreperson had been allowed to take the instructions home, "but that is because of her status as foreperson . . . the foreperson has a need to be perhaps better informed than anyone else as to where those instructions are located within that packet." No objection was made at trial to the court's explanation, and in any event we find no error. Contrary to defendant's contention, the court's comments did not convey a message that the opinion of the foreperson was more important than that of any other juror. The court merely explained that the foreperson should be in a position to assist deliberations by locating particular instructions within the large packet the jurors had been given.

### III. Penalty Phase Issues

#### A. *Vindictive Prosecution*

Defendant asserts the prosecutor's decision to pursue the death penalty in his case was the result of vindictiveness—that is, to punish him for pursuing his constitutional right to counsel and for having obtained a reversal of his previous conviction and death sentence. Defendant did not preserve the issue because he did not make any motion in the trial court based upon a theory of vindictive prosecution.[27] "Absent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." (*People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Because the trial court was not called upon to make a ruling, it did not conduct a hearing on this matter and made no findings of fact.

---

[26] For the same reasons, we reject defendant's argument that the trial court erred in admonishing the jurors at the penalty phase that they could continue to think about the case when separated, but not discuss it with anyone.

[27] During the jury selection process (but outside the presence of the jurors), defense counsel stated on the record that the prosecution had declined to accept defendant's plea of guilty in exchange for a sentence of life imprisonment without the possibility of parole. Defense counsel expressed his opinion that defendant was being penalized because of the earlier judgment having been reversed, and noted that at one point the prosecutor had indicated to him that accepting such a settlement would cause adverse publicity. Defense counsel stated, however, that he was mentioning these matters as "food for thought for the prosecution" and did not make any motion.

Furthermore, an inference of vindictive prosecution is raised if, upon retrial after a successful appeal, the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial. (See *In re Bower* (1985) 38 Cal.3d 865, 872–875 [215 Cal.Rptr. 267, 700 P.2d 1269].) In the present case, however, the prosecution sought the same sentence upon retrial that it did at the initial trial. The record thus contains no evidence supporting defendant's claim of vindictive prosecution.

### B. *Use of Evidence from First Trial*

At the penalty phase, defense counsel sought a ruling that, should defendant testify and state he was remorseful, the prosecutor would not be permitted to question him about the circumstances of the crimes or use defendant's prior testimony for impeachment. The court declined to make such a ruling, and defense counsel indicated that as a result he would not call defendant as a witness. Defendant contends the trial court's ruling denied him his rights to effective assistance of counsel and to testify in his own defense under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and article I, sections 7 and 15 of the California Constitution.

 Defendant has failed to preserve this claim of error. It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify. (See *Luce v. United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460] (*Luce*) [denial of in limine motion to preclude impeachment of the defendant with a prior conviction is not reviewable on appeal if the defendant did not testify]; *People v. Collins* (1986) 42 Cal.3d 378, 383–388 [228 Cal.Rptr. 899, 722 P.2d 173] (*Collins*) [prospectively adopting the *Luce* rule].)

Defendant argues that the *Luce* rule does not apply, because defendant's prior testimony was constitutionally tainted and because evidence that he had perjured himself in the prior trial would completely undermine his current testimony regardless of its content. (See *People v. Brown* (1996) 42 Cal.App.4th 461, 468 [49 Cal.Rptr.2d 652] [defendant need not testify in order to preserve his claim that trial court erred in admitting for impeachment purposes a statement obtained in violation of his right to counsel].) We are not persuaded. The rationale for the *Luce* rule applies fully here. First, in order to determine the admissibility of defendant's prior testimony, the court must balance its probative value against its prejudicial effect under Evidence Code section 352, an analysis that cannot be performed unless the record discloses the content of the defendant's testimony. (See *Luce, supra,* 469 U.S. at p. 41; *Collins, supra,* 42 Cal.3d at p. 384.) Second, if the defendant does

not testify, any possible harm from the trial court's ruling is wholly speculative. The ruling might change in response to the actual content of the defendant's testimony, or the prosecution might choose not to use the evidence at issue. (See *Luce, supra,* 469 U.S. at p. 41; *Collins, supra,* 42 Cal.3d at p. 384.) Third, if the trial court erred in its ruling, the appellate court could not "intelligently weigh the prejudicial affect of that error." (*Collins, supra,* 42 Cal.3d at p. 384; see *Luce, supra,* 469 U.S. at p. 42.) Here, defendant proposed to testify that he was remorseful more than 10 years after the offense. On the present record, it is impossible to evaluate what effect his false testimony many years earlier might have had on such a defense.

Defendant additionally contends the prosecutor improperly used the circumstance of defendant's first trial and death sentence to rebut mitigating evidence demonstrating remorse, consisting of his offer to plead guilty and accept a life sentence. The record does not support this contention. The prosecutor questioned some of the defense witnesses concerning whether defendant may have offered to plead guilty in order to avoid the death penalty, rather than because he felt remorse. There was nothing improper in this tactic. The prosecutor's questions constituted a reasonable response to the defense testimony and did not focus on the results of the first trial.

### C. Denial of New Jury for Penalty Phase

 Defendant asserts the trial court erred in denying his motion to impanel a new jury at the penalty phase. He contends this error violated both California law and his rights to due process and a fair and impartial jury under the federal Constitution and reduced the jury's sense of responsibility for its decision, in violation of *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*). In a capital case, the jury that decides guilt is required to decide the penalty "unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." (§ 190.4, subd. (c).) We review the trial court's ruling for abuse of discretion. (*People v. Kraft* (2000) 23 Cal.4th 978, 1069 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Defendant contends a new jury was required because the jury, having heard during the guilt phase that defendant previously was sentenced to death, could not impartially decide the penalty. We find no abuse of discretion. The court instructed that defendant was being retried as the result of the decision by this court that he did not receive a fair trial at his first trial, and that the jury was to "disregard completely the result of that first trial in deciding upon a verdict in the present trial." We are not convinced it would be impossible for the jury to follow such an instruction. In the penalty phase as in the guilt phase, the jurors heard all the relevant evidence and were in a position to

form their own conclusions based upon that evidence. There is no reason to believe they would have felt compelled to ignore the court's instruction and defer to the verdict of another jury that resulted from a prior trial.

*Caldwell, supra,* 472 U.S. 320, does not compel a different conclusion. In *Caldwell,* the prosecutor urged the jury not to view its role as determining whether the defendant would die, because the state Supreme Court would review the sentence for correctness. The high court reversed the death sentence, holding that such an argument creates a bias in favor of a death sentence and renders the jury verdict unreliable. In a subsequent case somewhat analogous to the present one, the high court concluded that the admission of evidence in a death penalty case reflecting that the defendant had been convicted of a prior murder and sentenced to death for that murder did not require reversal of the death judgment. (*Romano v. Oklahoma* (1994) 512 U.S. 1 [129 L.Ed.2d 1, 114 S.Ct. 2004] (*Romano*).) The court rejected the petitioner's argument that evidence indicating that he previously had been sentenced to death in a different and unrelated case violated the holding of *Caldwell, supra,* 472 U.S. 320, by diminishing the jury's sense of responsibility for the sentencing decision. The court in *Romano* reiterated that *Caldwell* simply requires that the jury not be mislead into believing that the responsibility for the sentencing decision lies elsewhere. (*Romano, supra,* 512 U.S. at p. 8.) The court in *Romano* found *Caldwell* inapplicable, because "the jury was not affirmatively misled regarding its role in the sentencing process. The evidence at issue was neither false at the time it was admitted, nor did it even pertain to the jury's role in the sentencing process." (*Id.* at p. 9.)

In *Romano,* the high court recognized that evidence establishing that the defendant previously had received a death sentence for another murder was not relevant to the jury's determination under state law. Nevertheless, the court concluded that "if the jurors followed the trial court's instructions, which we presume they did [citation], this evidence should have had little—if any—effect on their deliberations. Those instructions clearly and properly described the jurors' paramount role in determining petitioner's sentence . . . . In short, the instructions did not offer the jurors any means by which to give effect to the evidence of petitioner's sentence in the [prior] murder . . . ." (*Romano, supra,* 512 U.S. at p. 13.) As in *Romano,* the jury instructions in the present case made clear the jury's responsibility to determine defendant's penalty based upon the evidence presented to it and did not offer the jurors any means by which to give effect to the evidence of the prior proceedings.

### D. *Evidence of Other Violent Crimes*

Defendant contends that the prosecutor's notice of aggravating evidence was deficient and, for that reason, the trial court should have excluded

testimony that defendant shot at the owner of the A & J Market during a robbery attempt on March 6, 1979. Defendant relies on former section 190.3, which provided: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time, as determined by the court, prior to trial." (Stats. 1977, ch. 316, § 11, pp. 1258, 1259.)

In its notice of aggravating evidence, the prosecution stated it would present evidence establishing that on or about March 6, 1979, "defendant did commit an act of armed robbery while armed at the A & J Market . . . ." Defendant argues the prosecutor was required to specify more precisely what the evidence would be, including the testimony reflecting that defendant shot at the owner. No such requirement exists. Notice is sufficient if it affords the defendant a reasonable opportunity to prepare a defense. (*People v. Mayfield* (1997) 14 Cal.4th 668, 798 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "[T]he prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein." (*People v. Pride* (1992) 3 Cal.4th 195, 258 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We have no doubt the notice given was sufficient to permit counsel to prepare a defense, particularly because testimony concerning the shooting was presented at defendant's first trial as part of the evidence of this attempted robbery, and the record demonstrates that defense counsel was aware of the circumstances of the incident. For the same reason, the prosecution's notice that it would offer evidence indicating that defendant had committed an armed robbery of a gas station in Salt Lake City "on or about February 15, 1979" was sufficient even though the evidence presented was of a robbery committed on February 5, not February 15, of that year.

Defendant asserts the trial court erred in admitting the testimony of Floyd Cowdell reflecting that defendant had admitted returning fire after he had been fired upon after the attempted robbery of the A & J Market. Defendant asserts the testimony was improper because the prosecution failed to establish the corpus delicti for any crime of assault or attempted murder. As noted above, the corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements. (*People v. Alvarez, supra,* 27 Cal.4th at p. 1181.) As also noted above, however, the quantum of evidence required is not great, and "need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*Ibid.*) Contrary to defendant's argument, the shooting, which took place as defendant was fleeing from the A & J Market, was part of the

attempted robbery. Evidence of the corpus delicti of that crime was established by the testimony of one of the victims, Alaire Fivas, who witnessed the crime and testified that she heard a gun fire shortly after defendant ran out of the store.

## E. *Exclusion of Mitigating and Rebuttal Evidence*

Defendant challenges the trial court's ruling on the admissibility of numerous items of proposed mitigating or rebuttal evidence. We find no abuse of discretion in these rulings. We have concluded previously that evidence of the prison conditions for those sentenced to life imprisonment without the possibility of parole is not constitutionally or statutorily relevant as a factor in mitigation. (*People v. Sakarias* (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788].) The trial court did not err in precluding evidence reflecting that the prosecutor was not seeking the death penalty against defendant's accomplices, because the "sentence received by an accomplice is not constitutionally or statutorily relevant as a factor in mitigation." (*People v. Bemore* (2000) 22 Cal.4th 809, 857 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Defendant was permitted to introduce evidence establishing that he had attempted to plead guilty and accept punishment of life imprisonment without the possibility of parole, but he contends the trial court erred in ruling that he could not introduce evidence of the circumstances surrounding the plea negotiations, including the trial court's and the prosecutor's willingness at one point to consider a sentence of life imprisonment without the possibility of parole. The trial court did not abuse its discretion in excluding such evidence. As we previously have held, evidence of this sort does "not bear upon defendant's character, prior record, or the circumstances of his offense and thus, [does] not constitute mitigating evidence." (*People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

Nor did the trial court abuse its discretion in excluding George Perez's admission that he was "deeply involved" in the murder. Evidence of this admission was cumulative, because the jury already had heard, during the guilt phase, evidence demonstrating that George Perez and others were involved in the murder. Perez's admission was not relevant mitigating evidence, because it did not address his level of culpability in comparison with that of defendant and was not inconsistent with the prosecution's theory that defendant was the leader of the group and personally had shot and killed the victim.

### F. *Jury Instructions*

#### 1. *Moral culpability*

Defendant contends the trial court erred by instructing that a mitigating factor is "one that [is] considered as extenuating or reducing the degree of *moral culpability* of the defendant and which tends to support the imposition of a sentence of life without possibility of parole."[28] Defendant argues that the reference in this instruction to "moral culpability" prevented the jury from considering and giving effect to the full range of permissible mitigating evidence.

Defendant relies upon *People v. Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081] (*Lanphear*), in which we reversed the death sentence because of instructions that explicitly precluded the jury from considering sympathy for the defendant. In *Lanphear*, the jury was instructed that " '[m]itigating circumstances are circumstances that do not constitute a justification or excuse of the offense in question, but which, in *fairness and mercy*, must be considered in extenuating or reducing the degree of moral culpability.' " (*Id.* at pp. 165–166.) We rejected the Attorney General's argument that this instruction cured the prejudicial effect of the no-sympathy instruction, reasoning that "the extenuation instructions given suggested that only circumstances that lessen moral culpability are to be considered." (*Id.* at p. 166.)

■■■ An instruction defining mitigation in terms of moral culpability for the crime might, under some circumstances (such as those present in *Lanphear*), lead a jury to believe that it could consider only mitigating circumstances that related to the defendant's moral culpability for the crime. But such an instruction does not require reversal if, in context of the instructions as a whole, there is no reasonable likelihood that the jury was misled as to the scope of mitigating evidence. (See, e.g., *People v. Griffin* (2004) 33 Cal.4th 536, 594 [15 Cal.Rptr.3d 743, 93 P.3d 344] [definition of mitigating circumstance as "an extenuating circumstance" was not misleading, when instructions made clear that the jury could consider any aspect of the defendant's character or record offered by the defendant as a basis for a life sentence]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1189–1192 [13 Cal.Rptr.3d 34, 89 P.3d 353] [instruction that a mitigating factor "makes a crime less severe" was not misleading in light of other instructions that made it clear that mitigating factors need not be related to the crime].)

Defendant's jury specifically was instructed that "pity and sympathy for the defendant would be a proper consideration if you should find them to be

---

[28] The language of the instruction was based upon our explanation of mitigating circumstances in *People v. Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].

warranted in the circumstances." Included in the list of mitigating factors the jury was instructed to consider was "any sympathetic aspects of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to it [*sic*] offense for which he is on trial." The jurors were told not to "limit your consideration of mitigating factors to those specific factors. You also may consider *any other circumstances relating to the case or to the defendant* as shown by the evidence as reasons for not imposing the death penalty." (Italics added.) Furthermore, the jury was informed that "any one of the mitigating factors *or any other mitigating evidence* standing alone may support a decision that death is not the appropriate punishment in this case." (Italics added.) Accordingly, the instruction made clear that the jury could consider any circumstance related to defendant and any sympathetic reaction to that evidence as a basis for a life sentence.

### 2. *Direction to assume that the death sentence would be carried out*

During deliberations, the jury asked whether, in the history of the California justice system, there had "ever been a review or appeal or lessening of a sentence in regard to life without the possibility of parole?" In response, the court instructed the jury that it was not to speculate or consider matters not in evidence. The court stated: "Whether or not there are circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, you are to assume it would be carried out for purposes of determining the appropriate sentence for this defendant. You are to assume that if you sentence [defendant] to life in imprisonment without the possibility of parole he will spend the rest of his life in state prison, and you are to assume that if you sentence [defendant] to death he will be executed in the gas chamber." Defendant objected to this instruction at trial, and challenges it here, to the extent the instruction acknowledged that circumstances might preclude the punishment from being carried out.

Informing a jury that "whether or not there were circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, [the jury] should assume it would be carried out for purposes of determining the appropriate sentence for this defendant" is proper. (*People v. Thompson, supra,* 45 Cal.3d 86, 131; see also *People v. Davis* (1995) 10 Cal.4th 463, 547–548 [41 Cal.Rptr.2d 826, 896 P.2d 119] [trial court properly instructed jury, in response to question, that Governor could commute either sentence]; *People v. Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d 430] [if jury inquires about commutation, court should instruct that Governor may commute either sentence, but jury

must not consider possibility of commutation].) The trial court's instruction in the present case conformed to *Thompson* and was not inaccurate, prejudicial, or misleading.

Defendant also argues that the question itself was evidence of juror misconduct in that it revealed the jurors were considering facts outside the evidence—whether a sentence of life imprisonment without possibility of parole actually would be carried out. Because the trial court failed to conduct a hearing to determine the scope of this asserted misconduct, defendant contends, this evidence of misconduct raises a presumption of prejudice that has not been rebutted and requires reversal.

When a court is "put on notice that good cause to discharge a juror may exist," it is required to conduct an inquiry to determine the facts. (*People v. Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251]; see *People v. Davis, supra,* 10 Cal.4th 463, 547.) In appropriate circumstances a trial judge may conclude, based on a juror's willful failure to follow an instruction, that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror. (See, e.g., *People v. Daniels* (1991) 52 Cal.3d 815, 864 [277 Cal.Rptr. 122, 802 P.2d 906] [upholding the trial court's removal of a juror who had discussed the case with others and who had expressed an opinion on the issue of guilt].) But the jury's question in the present case cannot reasonably be construed as demonstrating that the jurors were unable or unwilling to follow the court's instructions. The circumstance that the jurors asked the trial judge for clarification suggests they merely were seeking to understand the meaning of the instructions they had been given and were unaware that discussion of such matters was improper. Because the trial court had no basis for doubting the jurors' ability or willingness to follow its instructions, further inquiry was not required. To the extent the jury's question suggested that jurors had been speculating about how the punishment of life imprisonment without parole had been implemented in the past, the trial court's instruction directing them not to do so was a sufficient response.

### G. *Refusal of Instructions Proposed by the Defense*

We find no merit in defendant's arguments that the trial court erred in refusing a number of instructions proposed by the defense.

The trial court properly denied instructions proposed by the defense that would have required the jury to "weigh" aggravating and mitigating factors. (See *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1025 [258 Cal.Rptr. 821, 773 P.2d 172] [trial court erred in giving instructions based on 1978 death penalty law in case to which 1977 law applied].) The 1977 death

penalty law under which defendant was tried did not require specifically that the jury weigh aggravating factors, and the jury was instructed, in accordance with that statute, to "consider, take into account and be guided by" the aggravating and mitigating circumstances. (See former § 190.3, added by Stats. 1977, ch. 316, § 11, pp. 1258, 1260.) Furthermore, we have noted that "there may well be no significant difference between" the 1977 law's requirement that the jury "consider" the aggravating and mitigating factors and the 1978 law's requirement that the jury weigh these factors. (*People v. Easley* (1983) 34 Cal.3d 858, 884, fn. 19 [196 Cal.Rptr. 309, 671 P.2d 813]; see *Murtishaw, supra,* 48 Cal.3d at pp. 1027–1028, fn. 12.) Because the jury was not instructed to weigh aggravating and mitigating factors, defendant's further request for an instruction that the jury could return a verdict of life imprisonment without the possibility of parole even if the aggravating factors outweighed the mitigating factors was irrelevant and unnecessary.

■ The trial court properly refused to instruct that if the jurors had a doubt concerning which penalty to impose, they must return a verdict of life imprisonment without the possibility of parole. We consistently have held that "[b]ecause the determination of penalty is essentially moral and normative . . . there is no burden of proof or burden of persuasion." (*People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376], citation omitted; *People v. Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395] [in case tried under 1977 death penalty law, trial court did not err in instructing the jury at penalty phase that the prosecution had no burden of proof].) "The jurors cannot escape the responsibility of making the choice by finding the circumstances in aggravation and mitigation to be equally balanced and then relying on a rule of law to decide the penalty issue." (*Hayes, supra,* 52 Cal.3d at 643.)

The court was not required to instruct the jury that it could "spare the defendant's life for any reason you deem appropriate and satisfactory." The jury was fully instructed concerning the scope of its discretion to impose a sentence of life imprisonment without the possibility of parole based on any evidence it deemed appropriate. The jury was instructed that it could consider, in addition to the mitigating factors listed, "any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. Any one of the mitigating factors or other mitigating evidence standing alone may support a decision that death is not the appropriate punishment in this case." (See *People v. Kimble* (1988) 44 Cal.3d 480, 510 [244 Cal.Rptr. 148, 749 P.2d 803] [court did not err in instructing jury to base its penalty determination on evidence presented during the trial rather than on factors unrelated to such evidence].)

Nor did the court err in refusing defendant's proposed instruction that the jurors were "not to be governed by conjecture, prejudice, public opinion, or

public feeling." The substance of this instruction was covered in other instructions. At the guilt phase, the jury was instructed not to be "influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." At the penalty phase, the jury was told to consider the instructions given during the guilt phase, but that the instruction previously given not to be influenced by pity or sympathy for the defendant did not apply. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 718, fn. 26 [248 Cal.Rptr. 69, 755 P.2d 253]; *People v. Weaver, supra,* 26 Cal.4th 876, 982.)

### H. *Prosecutor's Argument*

Defendant contends the prosecutor committed misconduct in his closing argument at the penalty phase. The same standards discussed above in relation to the guilt phase apply at the penalty phase. In addition, as noted above, as a general matter a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. (*People v. Medina, supra,* 11 Cal.4th at p. 761; *People v. Fierro, supra,* 1 Cal.4th at p. 211; *People v. Ratliff, supra,* 41 Cal.3d at p. 690.) To the extent defendant failed to object to some of the prosecutor's arguments, those claims are forfeited. Nevertheless, as explained below, we conclude there was no misconduct.

### 1. Caldwell *error*

Defendant argues the prosecutor improperly attributed responsibility for a death verdict to the court process, society, the Catholic church, and defendant himself, all in violation of the high court's direction in *Caldwell, supra,* 472 U.S. 320, that a death sentence is invalid if the penalty jury "has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at p. 329.)

We find no violation of the principles established in *Caldwell.* Defendant's argument is "at once excessively subtle in its consideration of the words of the summation in the abstract and insufficiently precise in its treatment of the language in its context." (*People v. Clair, supra,* 2 Cal.4th at p. 686.) The prosecutor commented that every fairness had been extended to defendant, and that "the decisions that will be reached eventually in this case" would not be made hastily or without adequate reflection. In context, this comment was a reference to the decision the jurors were to make, not to a decision by a court or any other entity that might review their verdict.

The prosecutor referred to the testimony of a priest who had testified for defendant, noting that, according to the priest, it was appropriate in his

religion for the state to employ the death penalty to protect society or deter crime. The prosecutor pointed out that the priest who testified was unaware of the circumstances of the crime, but that the jury was aware, and he asked the jury to use "that analysis" to evaluate the witness-killing special circumstance. This was a fair comment on the defense evidence and could not have diminished the jury's sense of responsibility for the death penalty verdict.

Several times, the prosecutor referred to the jury as the "conscience of the community" or as representatives of the community. Such a comment is not improper. (See *Caldwell, supra,* 472 U.S. at p. 333 [jury is called upon to "decide that issue on behalf of the community"].)

Finally, the prosecutor did not engage in misconduct in arguing that defendant had brought the death penalty upon himself—that there was only one appropriate penalty and it was "the one he selected through his very conduct, and that's the death penalty." An argument that the defendant is responsible for choosing to engage in conduct that deserves the death penalty is not improper. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1283 [91 Cal.Rptr.2d 211, 989 P.2d 645]; *People v. Arias* (1996) 13 Cal.4th 92, 180 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

### 2. *Appeal to jury's passions and prejudice*

Defendant contends the prosecutor appealed to the jury's fears, passions, and prejudices in arguing that the witness-killing special circumstance was a very serious aggravating factor because it was a threat to the criminal justice system, a killing "designed to simply destroy a system that all of us have the right to expect comfort and support and protection from." This argument was not improper. The prosecutor did not suggest that the jurors' lives would be directly threatened if defendant were not executed; he merely argued that the witness-killing special circumstance made defendant's crime particularly offensive to organized society and morally reprehensible.

### 3. *Comment on lack of remorse*

We find no merit in defendant's contention that the prosecutor commented on defendant's failure to testify, in violation of the Fifth and Fourteenth Amendments as construed in *Griffin v. California, supra,* 380 U.S. 609. The prosecutor argued that defendant's evidence of remorse was unconvincing because he had not fully accepted responsibility for his crimes. Numerous defense witnesses testified that defendant had expressed remorse about the crime but none testified that he had admitted what he had done; indeed, they testified that he had refused to discuss his involvement or claimed not to be able to recall what had happened. For example, Dr. Rosenthal testified that

defendant was upset that someone was killed and that he was involved, but claimed not to remember any specific thing that he had done. Similarly, Mr. Schiraldi testified that defendant felt responsible for what had happened and felt remorse, but that defendant claimed not to recall what had happened. Father Wood testified that defendant had admitted committing "a crime" and had said he was sorry. The prosecutor's argument was not a reference to defendant's failure to testify but was a fair comment on the defense evidence of remorse.

#### 4. · Comment on matters not in evidence

Defendant contends the prosecutor committed misconduct by encouraging the jury to speculate about matters not in evidence, in contravention of the trial court's rulings that prohibited the prosecutor from introducing evidence of defendant's nonviolent crimes, his incarceration as a juvenile, and a period of absence without leave while he was in the Army. In order to avoid opening the door to the prosecutor's presentation of evidence of these incidents in rebuttal, the defense did not present evidence of defendant's life history between 1965, when he was 14 years of age, until 1971, when he began living with his wife. The prosecutor pointed out this gap in the evidence, referring to these as the "lost years." He stated the jury should not speculate about what happened during those years, but argued that defendant had presented only a partial picture of himself, and that the jury really did not know much about him. This was a fair comment on the evidence.

#### I. Discharge of Juror Stephen W.

Defendant contends the trial court erred in discharging Juror Stephen W. during the penalty phase deliberations. On the morning of the fourth day of deliberations, the jury sent a note to the court indicating that one of the jurors had discussed the case with a family member. The court convened a hearing at which the juror, Stephen W., admitted that he had violated the instructions of the court by discussing the case with his wife. He stated that he needed to "straighten things out in [his] head," and in the process of "trying to sort the facts out" he had recounted the story of the case to his wife. He explained that his wife told him that he had a difficult decision to make and "gave some opinion [sic] which left me with the same decision that I had before." The juror testified that this discussion allowed him to think more clearly. Over defense objection, the trial court excused Stephen W. and seated an alternate juror. The court stated that Stephen W. deliberately and consciously had violated the court's order not to discuss the case outside of jury deliberations. The juror had a doubt about his opinion and voiced that doubt to someone outside the jury's deliberations, and his doubt was removed by that discussion.

The court may discharge a juror and substitute an alternate if it finds a juror is unable to perform his or her duty. (§ 1089.) A trial court's decision to discharge a juror for misconduct is reviewed for abuse of discretion and is upheld if supported by substantial evidence. (*People v. Williams* (2001) 25 Cal.4th 441, 447 [106 Cal.Rptr.2d 295, 21 P.3d 1209]; *People v. Cleveland, supra,* 25 Cal.4th at p. 474; *People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) The juror's inability to perform must " ' "appear in the record as a demonstrable reality." ' " (*Marshall, supra,* 13 Cal.4th at p. 843.)

Stephen W. admitted that he had discussed the case with his wife in violation of the court's admonition—an act that constitutes deliberate misconduct. (See § 1122, subd. (a).) "[A] juror's serious and willful misconduct is good cause to believe that the juror will not be able to perform his or her duty." (*People v. Daniels, supra,* 52 Cal.3d 815, 864.) In *Daniels,* this court upheld the removal of a juror who had discussed the case with others and who had expressed an opinion on the issue of guilt, stating that "a judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case . . . cannot be counted on to follow instructions in the future." (*Id.* at p. 865.) The trial court's conclusion that Stephen W.'s misconduct rendered him unable to perform his duty as a juror is supported by substantial evidence.

Defendant further asserts that the trial court erred in refusing defendant's request to discharge the entire penalty phase jury after it discharged Juror Stephen W., the defense having claimed that the remaining jurors would be incapable of starting penalty deliberations anew. The trial court instructed the jury in accordance with *People v. Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742], that the parties have a right to a verdict reached only after full participation by all twelve jurors, and that they must disregard their past deliberations and begin deliberations anew. As we stated in *Collins,* "We are confident that juries made aware of the rights involved will faithfully follow such instructions." (*Ibid.*) Defendant provides no reason for us to doubt that the jury in this case was able to follow the court's instructions.

### J. *Motion to Modify the Death Verdict*

The trial court denied defendant's motion to reduce his sentence to life imprisonment without the possibility of parole under section 190.4, subdivision (e). In its written findings, the trial court reviewed all of the relevant aggravating and mitigating factors, concluding that "the jury on the weight of the evidence and the law reached a just and proper verdict." The court also found "personally and independently . . . that the death penalty is proper in this case." The court did not take into account the lesser punishments

received by defendant's accomplices, noting that proportionality was not a proper factor for consideration. Nevertheless, the court stated that it agreed with Justice Mosk's dissenting opinion in *People v. Carrera* (1989) 49 Cal.3d 291, 347 [261 Cal.Rptr. 348, 777 P.2d 121], which stated that intracase proportionality should be considered by trial judges in ruling on section 190.4, subdivision (e) motions. The court commented that the other individuals involved in the crime were "getting away with murder" and that the prosecutor "should have, in all fairness, accepted [defendant's] offer to plead guilty with a penalty of Life Imprisonment without Possibility of Parole."

Defendant contends the trial court erred by (1) failing to "weigh" the aggravating and mitigating factors, and (2) considering the shooting in Utah as a factor in aggravation. We have rejected both of these arguments above with respect to the jury's verdict and accordingly, for the same reasons, find no error in the trial court's ruling.

Defendant also contends that reconsideration of the section 190.4, subdivision (e) motion is required because in conducting its review the court considered an invalid robbery special circumstance. In discussing section 190.3, factor (a), "[t]he circumstances of the crime . . . and the existence of any special circumstances," the court made no mention of the robbery special circumstance. Rather, the court gave weight to "a complete lack of mercy in the execution of the hapless victim." We find no reasonable possibility that the court's ruling would have been different had the robbery special circumstance not been found true.

▮ The trial court did not err in concluding that the lesser punishment given to defendant's accomplices was not an appropriate factor for its consideration. This court will undertake "intracase" proportionality review "to determine whether the death penalty is disproportionate to [the defendant's] personal culpability." (*People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Although such proportionality analysis takes into account the defendant's relative responsibility for the crime as compared to others who were involved, the disposition of codefendants' cases is not part of the analysis. (See *People v. Vieira* (2005) 35 Cal.4th 264, 302 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Riel* (2000) 22 Cal.4th 1153, 1223 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

### K. *Discretion to Strike Special Circumstances*

Defendant contends that the case must be remanded to afford the trial court the opportunity to strike the special circumstance findings in furtherance of justice under section 1385, subdivision (a), for the limited purpose of

imposing a sentence of life imprisonment without the possibility of parole.[29] He argues that because the trial court had the authority to strike the special circumstances and impose a sentence of life imprisonment *with* the possibility of parole (see *People v. Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029]), *a fortiori* the court must have had the authority to strike the special circumstances for the limited purpose of imposing a punishment of life imprisonment *without* the possibility of parole. Defendant cites no authority to support his contention that the court may strike a special circumstance finding for such a purpose, and we find none. If the special circumstance findings had been stricken, the court would have been required to impose a lawful sentence as authorized by the remaining verdicts and special findings. A sentence of life without the possibility of parole would not have been authorized in the absence of a true finding on at least one of the special circumstance allegations.

## L. *Cruel and Unusual Punishment*

Defendant contends on several grounds that his death sentence constitutes cruel and unusual punishment under the Eighth Amendment to the federal Constitution and article I, section 17 of the California Constitution. We disagree. The circumstance that George and Jesse Perez were allowed to plead guilty to the charge of accessory after the fact does not affect defendant's individual culpability and thus does not render defendant's death sentence cruel and unusual punishment. (See *People v. Hill* (1992) 3 Cal.4th 959, 1013–1014 [13 Cal.Rptr.2d 475, 839 P.2d 984].) A 25-year delay in carrying out the sentence does not render it cruel and unusual. (*People v. Hill, supra,* 3 Cal.4th at pp. 1015–1016.) Defendant's contention that it would be unconstitutional to execute him after this long period, because he now is a different person, cannot be resolved based on the record. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1183 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Execution by the administration of lethal gas does not constitute cruel or unusual punishment. (*In re Anderson* (1968) 69 Cal.2d 613, 631–632 [73 Cal.Rptr. 21, 447 P.2d 117].) In any event, defendant instead may choose to be executed by lethal injection. (§ 3604.)

## IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Defendant contends that, in numerous respects, his trial attorney rendered constitutionally ineffective assistance at both the guilt and penalty phases of the trial. In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's

---

[29] Section 1385.1, which prohibits a court from striking a special circumstance finding, was not adopted until June 5, 1990, and therefore does not apply to defendant's case. (See *Tapia v. Superior Court, supra,* 53 Cal.3d 282, 298–299 & fn. 17.)

performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." (*Strickland v. Washington, supra,* 466 U.S. 668, 688; see *Ledesma I, supra,* 43 Cal.3d at p. 216.) Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981].) If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859]; see *In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.)

As explained below, we conclude that defendant has failed to establish that defense counsel rendered constitutionally ineffective assistance. We do not address each of defendant's numerous allegations of deficient performance in detail, because all of these claims suffer from the same defect—the present record does not preclude the possibility that defense counsel's actions were based upon reasonable strategic decisions. As we repeatedly have emphasized, unless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Such claims are more appropriately addressed in a habeas corpus proceeding. (*Ibid.*)

Turning to these claims, defendant asserts that his attorney rendered ineffective assistance in failing to research adequately the relevant law and bring a variety of pretrial or in limine motions before making strategic decisions as to which defenses to present. He contends, for example, that counsel should have litigated the permissible use of material from the first trial and from the habeas corpus hearing (including Dr. Glathe's testimony), the admissibility of certain evidence related to the theory that Joe Guerra committed the crimes (such as the results of his polygraph examination), and the admissibility of the photographic lineup from which the victim Flores

identified defendant as the robber at the Hudson gas station. Defendant contends that pretrial rulings on such matters were critical to enable counsel to decide which defenses to present at trial, how to conduct effective voir dire of the prospective jurors, and how to avoid opening the door to damaging rebuttal evidence.

The record does not reveal the extent of the research conducted by defense counsel on the subjects of these motions, and we cannot draw the conclusion that counsel failed to research the law adequately. Nor can we conclude on the present record that no reasonable counsel would have chosen to proceed without obtaining pretrial rulings. "[T]he means of providing effective assistance are many and . . . as a consequence counsel has wide discretion in choosing which to use." (*Ledesma I, supra,* 43 Cal.3d at p. 216.) The trial court would have acted within its discretion in declining to make a pretrial ruling without hearing the witnesses' testimony. To the extent the evidence at issue was admitted to impeach defense witnesses, or was presented by the defense, counsel may have been unwilling to give the prosecution the benefit of a preview of the defense case in order to obtain such rulings.

Defendant also contends his counsel performed unreasonably in choosing to present inconsistent defenses—on the one hand reasonable doubt and potential third party culpability, and on the other hand diminished capacity. He asserts counsel's conduct was particularly deficient in the absence of a pretrial court ruling on the admissibility of defendant's confession to Dr. Glathe. Again, however, on the present record we have no basis for second-guessing trial counsel's decision.

Defendant complains that his counsel initially chose to keep from the jury the fact that defendant previously was convicted and sentenced to death for the same offense and accordingly failed to conduct voir dire on that subject, and that counsel followed this course of action without taking appropriate steps to ensure that knowledge of the prior proceedings would not be revealed to the jurors. Similarly, defendant complains that counsel presented a penalty phase defense that necessarily revealed to the jury defendant's prior conviction and custody status without ascertaining, through voir dire, what impact these circumstances would have on the jury. "[I]f the record does not preclude a satisfactory explanation for counsel's actions, we will not, on appeal, find that trial counsel acted deficiently." (*People v. Stewart, supra,* 33 Cal.4th 425, 459.) In the present appeal, we have no basis upon which to conclude that defense counsel failed to pursue a reasonable tactical choice in deciding not to bring these matters to the jury's attention at an early stage of the proceedings, but instead to rely upon the general voir dire and the court's

instructions to ensure that the jurors would be impartial and consider only relevant matters. (See *Stewart, supra,* 33 Cal.4th at p. 459.)

Defendant contends trial counsel rendered ineffective assistance by presenting certain evidence that opened the door to damaging rebuttal. In this category, defendant challenges, for example, defense counsel's decisions to present (1) the testimony of expert witnesses who had considered Dr. Glathe's report, leading to the admission of Dr. Glathe's testimony concerning defendant's confession; (2) evidence that Joe Guerra may have committed the offenses, which bolstered the credibility of prosecution witness Jona Cardona (who named Guerra as one of defendant's accomplices in the murder); (3) the testimony of a social worker at the penalty phase whose omission of certain damaging portions of defendant's social history allegedly was exploited by the prosecution; and (4) the testimony of a Father Wood, which injected the position of the Catholic Church on the death penalty into the proceedings and was used against the defense in the prosecutor's argument. In each of these and other related instances of allegedly ineffective assistance, the evidence at issue was of some obvious benefit to the defense. Accordingly, on this record, we cannot conclude that defense counsel had no reasonable basis for presenting it.

Defendant contends his counsel rendered ineffective assistance in argument to the jury at the penalty phase discussing uncharged special circumstances that the jury may have concluded were applicable to defendant's case, including kidnapping, financial gain, and atrocious or heinous acts. Defense counsel listed the various special circumstances in the context of arguing that the law makes the death penalty available in a wide variety of circumstances, but that it is not imposed automatically for any offense and should be reserved for only the worst offenders. The mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance by defense counsel. (*People v. Coddington, supra,* 23 Cal.4th 529, 655; *People v. Mincey* (1992) 2 Cal.4th 408, 471 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Finally, defendant makes a number of additional claims of ineffective assistance of counsel related to various contentions, discussed above, of error in the court's rulings or instructions or misconduct by the prosecutor. Defendant contends that, in numerous instances, his counsel performed deficiently in failing to make objections, request instructions, or cite relevant law. Because we have addressed the merits of the underlying contentions and have concluded, above, that the actions at issue were not erroneous or improper, that the instructions were not warranted, or that any alleged error was not prejudicial, defendant's related claims of ineffective assistance of counsel fail and do not require further discussion.

## V. DISPOSITION

The judgment is reversed as to the robbery charge set forth in count three; the robbery special circumstance is set aside, and the judgment as to guilt and penalty is otherwise affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 25, 2006.